## JOHN F. WEYLER, WARDEN OF THE MARYLAND PENITENTIARY, *vs.* FRANK T. GIBSON ET AL.

*Ejectment by Owner of Land Subject to Easement of Highway Against Trespasser—Right to Sue Warden of Penitentiary for Land Wrongfully Taken for Use of the State.*

The owner in fee of land which is subject to an easement of a public highway is entitled to maintain an action of ejectment against any person who has wrongfully taken and appropriated such land to his own exclusive use.

The principle that no action can be brought against the State without its consent does not operate to prevent a person whose land has been taken by a State official for the use of the State, or is in his possesion for State purposes, from suing such official in ejectment, since otherwise the owner would be deprived of his property without due process of law.

The Directors of the Maryland Penitentiary, in the course of building an addition thereto as directed by law, took possession of a street, the use of which had been dedicated to the public, but a fee simple title to which was vested in the plaintiffs, and constructed a building across it, without having either condemned the street or acquired the property rights of the plaintiffs by purchase. *Held,* that since the State is not amenable to suit, the plaintiffs are entitled to bring an action of ejectment against the Warden of the Penitentiary, the official in actual personal occupation of the premises, although not holding under any claim of right in himself.

*Decided June 1st, 1909.*

Appeal from the Superior Court of Baltimore City (NILES, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE and THOMAS, JJ.

*Isaac Lobe Straus, Attorney-General,* and *William S. Bryan, Jr.,* for the appellant.

While the suit a bar is nominally against The Directors of the Maryland Penitentiary and against John F. Weyler, its Warden, the real defendant is the State of Maryland, whose possession of the land in controversy as a part of the site of its State prison is sought to be disturbed. The Courts in determining questions of this sort will look through the form to the substance, and will see things as they really are. "If whether a suit is one against a State is to be determined, not by the fact of the party named as defendant on the record, but by the result of the judgment or decree which may be entered, the same rule must apply to the United States. The question whether the United States is a party to a controversy is not determined by the merely nominal party on the record, but by the question of the effect of the judgment or decree which can be entered." *Minnesota* v. *Hitchcock,* 185 U. S. 387; *Oregon* v. *Hitchcock,* 202 U. S. 69; *Morenci Copper Co.* v. *Freer,* 127 Fed. Rep. 205.

The English authorities seem to show that there can be no indirect method of subjecting a sovereign to the jurisdiction of the Courts. An unarmed packet belonging to the sovereign of a foreign state, and in the hands of officers commissioned by him, and employed in carrying the mails is not liable to be scized in a suit *in rem* to recover redress for a collision, and this immunity is not lost by reason of the packet also carrying merchandise and passengers for hire. *The Parlement Belge,* L. R., 5 Prob. Div. 197. See also *Atty-Gen'l.* v. *Hallett,* 15 Mees. and Welsby, 109, 110; *Doe, dem Leigh,* v. *Roe,* 8 Meeson and Welsby, 581.

And in *Bowker* v. *U. S.,* 105 Fed. Rep. 398, it was held that in a suit in admirality instituted by the U. S. Government to recover damages for injury to a government vessel by collision, the Court cannot entertain a cross-libel alleging the fault of such vessel and praying a decree against the United States for damages.

There are other Federal cases in the Supreme Court than the case of *Carr* v. *U. S.* earlier in date than *U. S.* v. *Lee,* 106 U. S. 196, which do not seem consistent with that decision. *Schooner Exchange* v. *McFadden,* 7 Cranch, 116; *The Davis,* 10 Wallace, 15; *The Siren,* 7 Wallace, 152.

The State cannot without its own authorization and assent be impleaded in and ousted by its own Courts from the possession and management of its institutions and property, whereby, through its lawful officers, it is discharging its public duties to the people who compose it. And this firmly settled principle of law and public policy cannot be evaded and defeated by bringing and prosecuting an action, which is *in effect and reality a suit against the State, ostensibly* as a proceeding *against a public official. Lowry* v. *Thompson,* 25 S. C. 416; *Alamango* v. *Supervisors,* 25. Hun. 551; *Moodey* v. *State Prison,* 128 N. C. 12; *Cunningham* v. *M. & B. R. Co.,* 3 Woods, 418; *Chemical Co.* v. *Board of Agriculture,* 111 N. C. 135; *Flagg* v. *Bradford,* 181 Mass. 315; *Burrill* v. *Auditor General,* 46 Mich. 256; *Printop* v. *Cherokee R. Co.,* 45 Ga. 365; *Tate* v. *Solman,* 79 Ky. 540.

In *Hopkins* v. *Clemson Agricultural College,* 77 S. Car. 12 (1907), it was held that the college, being a State agency, could not be sued in tort for damages to land caused by changing the current of a river in times of flood by the erection of a dike.

In *Litchfield* v. *Bond,* 93 N. Y. S. 1016 (1905), where the State Engineer and his assistants, acting under authority of a law providing for the survey of a county boundary line, entered on private property and cut down timber, it was said: "In the absence of fraud or collusion, the acts of public officers, within the limits of power conferred upon them and in the performance of the duties assigned, are the acts of the State. *People* v. *Stephens,* 71 N. Y. 527."

The Ejectment Statute requires (Code of 1904, Art. 75, sec. 71) that: "The action of ejectment shall be commenced by filing a Declaration in which the real claimant shall be

named as plaintiff, and the tenant in possession, or the party claiming adversely to the plaintiff shall be defendant."

Weyler is not the "tenant in possession" of the Maryland Penitentiary nor is he "the party claiming adversely" to the plaintiffs.

The Code (Art. 27, sec. 550), shows that the Warden is a mere servant of the Directors and that he is removable-from his office "whenever in the judgment of the directors the public interest may require such removal."

Not only does the statute law of this State define the duties and functions of the Warden of the Penitentiary, declaring in plain effect that that official is *not* in charge or possession of the State Penitentiary, but the law also affirmatively asserts who has charge and possession of the institution. It declares in terms so plain and certain as to leave no room for doubt at all that the Board of Directors have charge and possession of the property in question. (Code, Art 27, secs. 548, 559, 560 563.)

If the suit had been prosecuted and was maintainable against the person really in possession (*i. e.* the Directors of the Maryland Penitentiary) there is a sound defense on equitable grounds to it, even if the plaintiffs' title were otherwise valid and enforceable, and the immunity of an agency of the State from suit be waived.

If the Directors of the Penitentiary by mistake built over the bed of the street while they had no legal right to do so, and the owners of the bed of the street let them do so, these owners must pay for the improvements erected in good faith before they can require the building to be taken down. *Broumel* v. *White,* 87 Md. 621; *Union Hall* v. *Morrison,* 39 Md. 281.

If the owners of the fee stood by and allowed the improvements to be erected over the street bed they could not afterwards invoke the aid of a Court of equity. *B. and O.* v. *Straus,* 37 Md. 241, 242.

To obtain any relief in equity on such grounds, however, and therefore to be able to plead such facts by way of equi-

table defense in a suit at law it is necessary for the defendant, seeking to avail himself of the equitable defense, to aver that he is in possession of the property. *Textor* v. *Shipley,* 77 Md. 473, 476; *Keys* v. *Forrest*, 90 Md. 134.

Consequently this defense could not be made by Warden Weyler, who was never in legal possession of the property.

There is another reason why this equitable defense could not be made by Warden Weyler, but could be made by the Directors of the Penitentiary. In addition to showing that he is in possesion of the property, it is also necessary for the person making this equitable defense to show that he is a *bona fide* holder of the property, who did not know that his title was contested, and that, supposing himself to be entitled to the property, he in good faith made the improvements on it. *McLaughlin* v. *Barnum,* 31 Md. 453, 454. Mr. Weyler was neither in possession, nor did he make and pay for the improvements in building the new Penitentiary.

And if the proper defendant cannot be sued because "a quasi corporation or governmental agency upon which liability to suit is not imposed by any statute," as was held by the learned Judge below in his opinion, it seems evident that the law intended that in such cases the sole remedy should be by an appeal to the General Assembly, and not by a contest in the Courts. It is submitted that it was never intended by the law that the fact that the defendant in possession was immune from suit should authorize the plaintiffs and the Court below to disregard the direction of the Ejectment Statute, that the suit must be brought against "the tenant in possession" or "the party claiming adversely to the plaintiff."

There is another clause in the Ejectment Statute which shows that it was not the intention of the law that this form of action should be maintained against public officers occupying property in their official capacity for and on behalf of the State for public purposes. Code of 1904, Art. 75, sec. 71, provides: "And the plaintiff shall also recover as damages in this action the *mesne* profits and damages sustained

by him and caused by the ejectment and detention of the premises up to the time of the determination of the case."

From this it is apparent that the lawmaking power never contemplated that the action of ejectment should be brought.

It is fundamental and elementary that for the plaintiff in ejectment to recover he must show himself to be entitled both to the legal title and to the immediate possession of the property sued for, both at the time the suit is instituted and at the time the verdict is rendered. *Berry* v. *Derwart,* 55 Md. 71; *Lannay* v. *Wilson,* 30 Md. 545, 546.

The plaintiffs and appellees are not entitled to the possession of the bed of Great Constitution street because Ordinance 111, approved October 17th, 1892, "authorized and directed" the Commissioners for Opening Streets "to condemn and close" Clifton Place (another name for Great Constitution street).

It was consequently manifest that before the street was to be legally closed it was the intention of the Mayor and City Council that the formalities should take place and the assessments of damages and benefits should be made and collected, which are required by the City Code.

Before the owners of the fee in the street bed could become entitled to enjoy the possession of the street bed relieved of the public easement thereon, the amount of benefits had to be ascertained by the Commissioners and paid by the property owners. Until this was done Great Constitution street remained legally a public street of Baltimore.

It seems to be generally held that a municipality can only vacate a street in accordance with the statutory directions. 28 *Cyc.* page 840 and note 77; *Idem,* 841, 842; *St. Louis R. R.* v. *Belleville,* 122 Illinois, 376.

Non-user of a public way is not an abandonment of it. 28 *Cyc.* 841, 842; *Henshaw* v. *Hunting,* 1 Gray, 203; *Wolf* v. *Sullivan,* 133 Ind. 331; *Seabright* v. *R. R.,* 73 N. J. Law, 625; *Baltimore* v. *Frick,* 82 Md. 87; *Ullman* v. *Charles St. Ave. Co.,* 83 Md. 144-5.

It was suggested by the appellees in the Court below that since the Penitentiary was built over the bed of Great Constitution street that street had been abandoned, and the case of *Baldwin* v. *Trimble,* 85 Md. 396, was relied on.

It is respectfully submitted that there has been here no abandonment by the public authorities and that *Baldwin* v. *Trimble* is not apposite. In that case it was held that while an encroachment on a highway is a public nuisance which can never grow by prescription into a private right, yet there are cases where, when the use of a highway has been totally abandoned by the public and private rights have grown up in consequence of such abandonment, an equitable estoppel is created against the public to assert a right to the use of the highway.

Here no private rights have grown up in the appellees on the faith of the abandonment or non-user of the street by the public. They have expended no money on the faith of the street being abandoned nor have they done anything else on the faith of this abandonment which would make it inequitable *as against them* for it to be insisted that the street is still a subsisting highway. (85 Md. 403-404.)

If the plaintiffs and appellees wish to have ascertained, *and to pay,* the benefits which will be assessed against them and to thus obtain the right to the possession of the bed of Great Constitution Street, they can demand of the City authorities to proceed to condemn and close this street, and if the City authorities without just excuse fail or refuse to proceed with the closing, they can be compelled to do so by an appropriate Mandamus proceeding. But until the street is legally closed, and until the plaintiffs and appellees pay the benefits assessed against the street bed, they are not entitled to the possession of this street bed.

That the rights of the public and the character of the easement in city streets is very much more extensive and exclusive than is the easement of the public in an ordinary country highway is settled. *Water Co.* v. *Dubreuill,* 105 Md. 427, 428; *Montgomery* v. *Railway Co.,* 104 Cal. 193.

It has consequently been held by the highest authority that the owner of the fee in the bed of a city street is not entitled to such possession of it as to enable him to maintain ejectment therefor. *City of Cincinnati* v. *Lessee of White,* 6 Peters, 431; *Lansburgh* v. *Dist. of Col.,* 8 Appeal Cases (D. C.), 10, 17. See also *Stiles* v. *Curtis,* 4 Day, 328; *Peck* v. *Smith,* 1 Conn. 114, 115, 116, 117, 118; *Hunter* v. *Sandy Hill,* 6 Hill, 407, 410, 411; *Redfield* v. *Railway Co.,* 25 Barb. 58; *A. and N. R. R. Co.* v. *Manley,* 42 Kansas, 586, 587; *Adams on Ejectment,* 34; *Newell on Ejectment,* page 685, sec. 64.

On the same principle it has been held that the owner of the fee in the bed of a turnpike road cannot bring ejectment against the turnpike company unlawfully laying rails on such roadbed, because ejectment is a possessory action and the owner of the servient fee is not entitled to the possession of the bed of the turnpike road. *Becker* v. *Turnpike Co.,* 195 Pa. St. 503.

*Frederick H. Fletcher* and *Randolph Barton, Jr.,* for the appellees.

Our law recognizes the principle, inherited from the common law, that the State, as the sovereign, is exempt from suit, unless by its consent. On the other hand, the Constitution, both State (Art. III, sec. 40) and Federal (14th Amendment), provides that no citizen shall be deprived of his property without due process of law and compensation first paid or tendered.

If the principle of the State's immunity from suit is carried to the point of holding that the State may seize and retain the property of a citizen, without any redress on his part, the provision of the Constitution is practically nullified—to say nothing of the injustice of such a view. It is one thing to hold that the Satte cannot be compelled to pay, out of its own funds, claims against it, except when and as it thinks best. It is quite another thing to hold that a State agent may take possession, without right or law, of private

property, and be absolutely immune from disturbance in his possession of it, no matter how absolutely lacking the State's title may be, purely because he claims to hold it "for the State." To avoid any such result and to give effect to the above constitutional provision, the Courts of this country have uniformly held that while the State, as such, is non-suable, even in cases such as this, the individual in actual possession of plaintiff's property may be sued for the recovery of that specific property, and that where it can be shown that the State has no title the actual possessor will not be allowed to set up as a defense that he is holding for and by authority of the State. If the State has no right to hold the property, it cannot lawfully authorize an alleged agent or representative to hold for it. This may seem, and possibly is, a refined distinction, but it is an absolutely necessary one in order to prevent gross injustice. Otherwise, as Judge Niles suggested, if tomorrow Mr. Weyler should by force take possession of, say, the Alexander Brown & Son building, and begin to use it as a part of the penitentiary, the owners would be absolutely helpless and without redress, notwithstanding their constitutional rights, simply because he claimed to be doing this for State purposes. The distinction is recognized by all the authorities. In *Harris* v. *Elliott,* 10 Peters, 25, a case arose almost precisely similar to the one at bar, in which the heirs of the original dedicator of the street bed brought ejectment against the commandant of the United States navy yard, on the ground that the use of the streets as such having ceased, the easement had ended and the rights of the original owner or his heirs had revived.

Here, while the question of the right to sue to recover property in the possession of the State was not discussed, such a suit was allowed.

In *United States* v. *Lee,* 106 U. S. 196, however, the question was expressly raised and flatly decided. The heirs of General Lee brought ejectment to recover possession of "Arlington," then used as a military station or fort. The military officers in charge were made defendants.

In *Cunningham* v. *Macon, etc., Ry.*, 109 U. S. 446, the
doctrine of the *Lee Case* was reaffirmed, the Court distin-
guishing the class of cases covered by the doctrine of the *Lee
Case.*

In *Tindal* v. *Wesley,* 167 U. S. 204, the whole subject was
again elaborately considered, resulting in the complete re-
affirmance of the doctrine of the *Lee Case.*

This case is particularly interesting, because the defendant
set up that he was a State official, and the Court holds that
"whether a particular suit is one against the State within
the meaning of the Constitution depends upon the same prin-
ciples which determine whether a particular suit is one
against the United States."

In *Smith* v. *Reeves,* 178 U. S. 438, *Tindal* v. *Wesley,* is
in turn affirmed, and illustrates the distinction which is made
between suits to recover *specific property* and suits merely to
enforce a general money claim.  See also *O'Reilly* v. *Brooke,*
135 ·Fed. 388, holding that actions of *ejectment, replevin,
etc.,* may be maintained against State officers.

While, never as far as we know, directly presented before
in this Court, the principle was apparently recognized, many
years ago, in the case of *Reddall* v. *Bryan,* 14 Md. 444, where
a bill was allowed to lie against certain *commissioners* ap-
pointed by the U. S. Government to secure a water supply
for the city of Washington, to restrain them from taking cer-
tain property of the complainants without due process of law.

Many cases, Federal and others, were cited below by ap-
pellant, such as *Steamer Siren* v. *U. S.,* 7 Wall. 152, in which
it was held that a man-of-war could not be libelled, etc.  But
it will be found in every case in which the "immunity of the
sovereign" was sustained as a defence, the thing attacked or
sought to be recovered, was not the *plaintiff's property,* but
admittedly *the State's.*  An action of ejectment or replevin,
in which the *specific property* of the plaintiff is demanded, is
one thing.  A suit merely to enforce against the State a
*money claim* of the plaintiff, either by general suit or by a
specific proceeding against some particular property of the

defendant, is quite a different thing. *Smith* v. *Reeves,* 178 U. S. 439. In the former case a constitutional right of the plaintiff (that his property shall not be taken without compensation) is involved and must be protected. In the latter case, no such constitutional right is in issue.

Defendant's counsel however suggest that inasmuch as the *Penitentiary Board itself* is non-suable, under the Statute creating it, therefore, Mr. Weyler, its warden, is necessarily as immune from suit as is the board, and that "a thing cannot be done indirectly which cannot be done directly." This very principle which they invoke however, shows, when properly applied, the fallacy of their argument. If, as all the authorities hold, the State itself cannot prevent suits against its own direct representatives to recover from them property that is wrongfully withheld from the real owners, even though by authority, and in the name of, the State, certainly the State cannot accomplish this by creating *a corporation,* and making *it* non-suable, and thus enabling *that corporation* to withhold through *its* agents, property which could not be so placed beyond the reach of its true owners by putting it in charge of direct representatives of the State. It could hardly be claimed for instance that in the *Lee case,* although the direct representative of the United States Government was suable in ejectment, the government might have defeated the suit by incorporating a company to hold the Arlington Estate and operate it as a fort, making that company non-suable, and letting such company make the commandant of the fort *its* agent and not the direct representative of the "State." Certainly that would be "doing indirectly what can not be done directly." Nor is there force in the contention that a *penitentiary* is such a vital part of the machinery of government that *"ex necessitate"* no suit of any kind will be permitted which may in any way disturb its operation. If a fort or a navy yard, designed to protect and preserve the very integrity of the nation, are not by reason of their character excepted from the rule above indicated, a penitentiary can hardly be. No case has been and we confidently assert can be, cited which

makes any such distinction in favor of jails or penitentiaries.·
Of course, there are many cases, such as *Moody* v. *State
Prison,* 128 N. C. 12, *Clodfeter* v. *State,* 86 N. C. 51, *O'Hare*
v. *Jones,* 161 Mass. 391, *Almingo* v. *Supervisors,* 25 Hun.
551, which hold that a State penal institution or its officials
cannot be sued unless such suits are expressly allowed by the
State; but these are merely in line with the doctrine, well
established in this State as elsewhere, on which rest such
decisions as *Weddle* v. *School Commissioners,* 94 Md. 334;
*Perry* v. *House of Refuge,* 63 Md. 27.

All the cases cited involved efforts, by the plaintiff, not to
recover his own specific property (where a constitutional right
would be involved as we have already shown) but to make
the defendant respond in damages, out of funds admittedly
belonging to the defendant and to which the plaintiff had no ·
specific claim whatever—in fact which had been dedicated to
a purpose totally at variance with that to which the plain-
tiff's suit sought to divert them.          ｡

The easement of the public in Constitution street as a street
has been abandoned and lost and the city has no longer any
rights therein.

The plaintiffs are entitled to maintain ejectment against
the defendant even if technically the easement of the public
in the street still exists.

The settled doctrine of the Maryland Courts and of the
great majority of other jurisdictions, whatever may be the
rule prevailing in some forums, is that the dedication of any
highway, for use as a highway, whether it be called a high-
way, road, turnpike or street, creates merely an easement in
the land so dedicated in favor of the public, and like any
other easement, does not disable the owner of the servient
estate from maintaining ejectment against some one who un-
lawfully deprives him of that estate, by appropriating the
land to a use other than the servitude.  He may sue and re-
cover possession subject to the easement, whether it be a pub-
lic easement or a private easement.  15 *Cy.,* page 25; *West-*

*lake* v. *Koch,* 134 N. Y. 58; *Elliott, Roads and Streets,* sec.
669; *Newell on Ejectment,* sec. 22.

BURKE, J., delivered the opinion of the Court.

The appellees on this record, as the heirs at law of Thomas
King Carroll and wife, are the owners in fee of the land sued
for in this case. It comprises the bed of what was formerly
Constitution street in the City of Baltimore. This street was
dedicated to public use by Mr. Carroll and his wife in 1831
by certain grants of lots abutting thereon, but by the terms
of the conveyances the title to the street itself remained in
the grantors, and that title is now vested in the appellees.

The State, finding it necessary to enlarge and extend the
Maryland Penitentiary, provided, by the *Act of 1900, Chap-
ter 200, that* the directors of the Maryland Penitentiary
should have power to contract for, purchase and hold in fee
simple or for a term of years all the several lots of ground
and their improvements in Baltimore City lying between
Eager street on the north, Concord street on the west, Trux-
ton street on the south and Forrest street on the east. The
land described in the declaration lies within these bounds.
In case the said directors could not agree with the owner or
owners of any of the land, or of any interest in the same, they
were given power to condemn.

In pursuance of the power conferred by the Act, the di-
rectors acquired title to all the lots abutting on Constitution
street, but did not acquire from the appellees or either of
them title to the bed of that street.

They secured the passage by the Mayor and City Council
in October, 1892, of an ordinance providing for the closing
of Constitution street, but nothing further was done, and the
street was never legally closed.

It became necessary in the enlargement of the penitentiary
to occupy the bed of Constitution street. The directors, with-
out authority of law, simply took possession of the street and
erected a part of the buildings of the Maryland Penitentiary
across it.

What was done is thus described by Mr. Weyler: "The bed of Constitution street is covered by the west wing of the main building—the Eager street wing. This was begun after the appropriation of 1896, and as near as I can remember in the year 1896. The buildings were completed and moved into— we occupied them on December 10, 1899. After the beginning of this wing, in 1896, Constitution street was not at any time open or used as a street. When the construction of this wing began we had to commence with the foundations' of the west wing; that involved building across Constitution street, and after that Constitution street could not be used for purposes of public travel by the public. As near as I can remember, this may have been in 1895, but I am almost positive it was in 1896, because we could not do anything to the property until after we had got the $500,000 appropriation. The exterior part of the walls of the Eager street wing are of granite and the interior of brick. It goes right across the bed of Constitution street. No part of the bed of Constitution street is open between Eager and Truxton street. It is not entirely covered by the building, part of it is vacant ground inside of the institution. The outer walls are on Eager street crossing Constitution street. The building on this wing is about fifty or fifty-five feet high; the wing is used for cells for housing the prisoners. These walls at the base are three feet wide, running up to about two feet. The entire buildings, including steel cells, equipment of buildings, cost in the neighborhood of $913,000, without the ground— that is, the wing on Forrest street, the administration building, the wing on Eager street, the power house and the long building for the dining room and kitchen. The administration part of the building fronts on Forrest and Eager streets, and is eighty-six feet square. The part of the building over the bed of Constitution street is absolutely essential to the rest of the building. There was paid for property taken for the penitentiary on both sides of Constitution street less than $30,000."

On the 24th of March, 1904, the appellees brought an action of ejectment in the Superior Court of Baltimore City against the Directors of the Maryland Penitentiary and John F. Weyler, its Warden, for the recovery of the bed of Constitution street described in the declaration, and on the 26th of March, 1907, an amended narr. was filed. The defendants appeared and pleaded they did not commit the wrong alleged, and also two pleas of limitation. An additional plea was subsequently filed, in which it was averred that the premises in controversy are covered in part by the Maryland Penitentiary building. The plaintiffs joined issue upon the first plea, and the Court held the rest bad on demurrer. In disposing of the demurrer the Court held that the Directors of the Maryland Penitentiary being a *quasi* corporation or governmental agency upon which liability to suit has not been imposed by statute, the suit against it could not be maintained. Mr. Weyler, the Warden, then filed four additional pleas:

1. That the land described in the declaration in this case is covered by a portion of the building of the Maryland Penitentiary, a prison of the State of Maryland, and that this defendant is Warden of the said penitentiary, with the duties prescribed by law and by the by-laws of the said penitentiary, a copy of which by-laws is herewith filed, marked "Exhibit Warden" and prayed to be taken as part of this plea; and this defendant further says that, other than performing his duties as Warden of the said Maryland Penitentiary, this defendant has no title to or interest in or connection with the land described in the declaration.

2. And for a second additional plea—leave of Court to file the same having been first had and obtained—the said John F. Weyler says that the land as described in the declaration is a part of the bed of Constitution Street, one of the public highways of Baltimore City; and that an ordinance was duly and regularly passed by the Mayor and City Council of Baltimore providing for closing said Constitution street, but that the proceedings for closing said street had

not been completed by the Commissioners for Opening Streets and filed in the office of the City Registrar up to the time of filing this plea.

3. And for a third additional plea to the declaration in said cause, says that he is an employee of the directors of the penitentiary, and holds his employment under and at the will of said directors and subject to the rules and regulations adopted by said directors.

4. And for a fourth additional plea, he says that he is an employee of the Directors of the Maryland Penitentiary and holds his employment under and at the will of said directors and subject to the rules and regulations adopted by them, and that neither by virtue of his said employment nor of the rules and regulations adopted by said directors is he in possession or charge of the property mentioned in the declaration in this cause or of the management thereof.  ·

He filed with these pleas and prayed that it might be taken as a part thereof a copy of the by-laws of the Maryland Penitentiary. This is certainly a most unusual method of pleading in a law case, and we are not to be understood as approving or sanctioning it.

The plaintiffs demurred to the additional pleas and also amended the declaration by eliminating thereform as a party defendant, the Directors of the Maryland Penitentiary, and by changing the words "its Warden" and inserting after the name of the defendant, John F. Weyler, the words "Warden of the Maryland State Penitentiary."

The demurrer to the four additional pleas was sustained, and the case was tried before Judge Niles without a jury upon a joinder of issue on the plea of not guilty, and resulted in a verdict and judgment for the plaintiffs for the property described in the declaration, and one cent damages and costs. From this judgment the defendant has prosecuted this appeal.

No question is made as to the ruling upon the pleas of limitation. It is admitted that the defendant was not thereby injured and that the correctness of the Court's action upon

these pleas need not be considered. The case has been ably argued by counsel on both sides, and they have given the Court in their carefully prepared briefs the benefit of a clear statement of their respective contentions and a full citation of authorities bearing on the questions involved.

Assuming the existence of the public easement in Constitution street created by Mr. Carroll and wife, as herein stated, does the fact of that existing easement prevent the plaintiffs from maintaining this suit?

The adjudged cases are so numerous in support of the right to maintain an action against a wrongdoer, who has taken possession of the property and is using it for purposes utterly inconsistent with its use as a street, that the right of the plaintiffs to prosecute the suit ought not to be seriously questioned. The rule that the owner of the fee in land subject to the easement of a public highway, street or common, may maintain ejectment against a person who has wrongfully seized and appropriated such land exclusively to his own use is supported by the overwhelming weight of authority.

A great many authorities were cited in the brief of the appellees establishing this rule, and in the note to the case of *Bork and Wife* v. *United New Jersey Railroad and Canal Co.,* 1 Am. and Eng. Annotated Cases, 861, will be found a full collection of cases on the subject.

In this case, upon the assumption we have made as to the existing easement, the property of the street is in the appellees as the owners of the soil, subject to the easement for the benefit of the public, and the mere fact that such an easement may exist is no reason why the suit may not be maintained; but the judgment is necessarily subject to the easement, if any exists.

The owner of the fee in the land, subject to the easement of the highway or street, cannot of course maintain an ejectment against the municipality or other lawful public authority which is occupying the street within the limits of the public right. This was the real question decided in the *City of Cincinnati* v. *Lessee of White,* 6 Peters, 431, and *Lansburgh*

v. *District of Columbia,* 8 Appeal Cases, 10. In *Lansburgh's Case, supra,* the suit was against the District of Columbia to recover a portion of the land used as a street, and the Court recognized in its opinion the clear and obvious distinction between a case of that character and one by the owner of the fee to eject a trespasser from property subject to an easement. "This is not," said the Court, "the case of a suit by the owner of land with a highway upon it against a trespasser holding adversely to the owner as well as to the public right. In such case it may be that the owner of the fee could recover possession in ejectment, subject to the public easement, and there is much authority in support of his right to do so."

A separate discussion of the other pleas, which were held bad on demurrer is unnecesary as the two propositions which they assert are: first, that the suit cannot be maintained under any circumstances, because it is in effect a suit against the State to recover the possession of property in the actual use by the State for police and State purposes; and second, because the possession of John 'F. Weyler as Warden, is not such a posession as would authorize his being made a defendant in the action of ejectment. JUDGE DILLON, in his work on the *Laws and Jurisprudence of Eng. & Am.,* 207, said: "That all of the original States in their first Constitutions and Charters provided for the security of private property, as well as life and liberty. This they did either by adopting, in terms, the famous thirty-ninth article of Magna Charta which secures the people from arbitrary imprisonment and arbitrary spoliation, or by claiming for themselves, compendiously, all of the liberties and rights set forth in the great Charter."

Our Declaration of Rights (Article 19) declares that every man for any injury done to him in his person or his property ought to have remedy by the course of the law of the land, and (Article 23) that no man ought to be deprived of his property, but by the judgment of his peers, or by the law of the land, and section 40, Article 3 of the Constitution prohibits the passing of any law authorizing private property to

be taken for public use, without just compensation as agreed between the parties, or awarded by a jury, being first paid or tendered to the party entitled to such compensation. Nor shall any State deprive any person of his property without due process of law. *Section 1, 14th Amendment of the Constitution of the United States.* Speaking of this amendment JUDGE DILLON says: "It was of set purpose that its prohibitions were directed to any and every form and mode of State action—whether in the shape of constitutions, statutes, or judicial judgments—that deprived any person, white or black, natural or corporate, of life, liberty, or property, or of the equal protection of the laws. Its value consists in the great fundamental principles of right and justice which it embodies and makes part of the organic law of the nation."

It is conceded that no suit can be brought against the State, without its consent. This immunity of the State from suit rests upon grounds of public policy, and is too firmly fixed in our law to be questioned. But it would be strange indeed, in the face of the solemn constitutional guarantees, which place private property among the fundamental and indestructible rights of the citizen, if this principle could be extended and applied so as to preclude him from prosecuting an action of ejectment against a State Official unjustly and wrongfully withholding property, by the mere fact that he was holding it for the State and for State uses.

It is easy to see the abuses to which a doctrine like that would lead. That such is not the law has been conclusively settled by *United States* v. *Lee,* 106 U. S. 106; *Tindel* v. *Wesley,* 167 U. S. 204; *Smith* v. *Reeves,* 178 U. S. 438; 10 *Am. and Eng. Ency. of law,* 528.

The only other question to be considered is this, is the character of the appellants' possession such that he can properly be made a defendant in this suit? We think it is. The general rule upon this subject is thus stated in 7 *Ency. Pl. & Prac.,* 303: "Where a mere servant or employee of the beneficial occupier of the premises, who claims for himself no interest therein, or no right to their possession, is in

temporary possession thereof, he cannot be made a defendant in ejectment, unless he assumes the character of a tenant. And where the employer is in possession of premises through a mere servant and is not himself amenable to process, the rule in such case cannot be applied, and the employee becomes the proper party defendant."

The latter branch of this rule applies directly to the appellant's contention. But we cannot treat Mr. Weyler as a mere servant or employee. He holds his position, it is true, at the pleasure of the directors; but he is an important State Official, charged with duties and responsibilities of a very grave and serious nature. He is in the actual, personal occupation of the premises. He resides upon them, and in addition to his salary receives an allowance "of subsistence and fuel, and occupancy as a dwelling of such parts of the front building as are not used for prison purposes, also all necessary out buildings, yards and grounds not within the walls of the prison proper." 1 Vol., *Code,* 1904, Art. 27, section 554.

The judgment will be affirmed, and if the directors cannot agree with the owners of the land sued for, they may condemn the same under the Act mentioned, or take such other action as they may be advised is proper.

> *Judgment affirmed with costs above and below.*