747 A.2d 617

**Jane DOE**

**v.**

**John DOE.**

**No. 99, Sept. Term, 1998.**

Court of Appeals of Maryland.

March 7, 2000.

114

Paul Mark Sandler (Laura L. Murry, Freishtat & Sandler, Baltimore; Thomas C. Ries, Kaufman, Ries & Elgin, P.A., Towson, all on brief), for Respondent.

M. Albert Figinski (David W. Erb, Saul, Ewing, Weinberg & Green, on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW *, WILNER, CATHELL and THEODORE G. BLOOM (Retired, specially assigned), JJ.

ELDRIDGE, Judge.

The issue presented in this case is whether Maryland law recognizes tort actions filed by a husband against his wife for fraud and intentional infliction of emotional distress when the actions are based upon the wife's alleged adultery and subse-

---

* Chasanow, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

quent misrepresentation of the paternity of children born during the marriage.

## I.

Jane Doe, the petitioner, and John Doe, the respondent, were married on September 2, 1989. During their marriage, three children were born: J.D. Doe, born February 21, 1992, and the twins A.E. and Z.S. Doe, born July 10, 1993. Unbeknownst to Mr. Doe, beginning in 1990 Ms. Doe had been sexually involved with her art professor, M.G. Mr. Doe did not learn about the affair until July 1996, when he discovered a letter written by Ms. Doe to M.G., which stated, in part:

"It remains my belief that at some point in the course [of] our relationship I disappointed you deeply, and that this is ... responsible for bringing about the distance which has complicated our interactions during the past few years. The commencement of this change seems to roughly correlate with the birth of our children.... You will always be the father of my children.... The divulging of their identities will be at your discretion."

After reading the letter and confirming his suspicions in a telephone conversation with M.G., Mr. Doe confronted Ms. Doe who denied the allegations. The next day, July 12, 1996, Mr. Doe filed in the Circuit Court for Baltimore County a complaint for absolute divorce. The complaint alleged that Ms. Doe had committed adultery, and requested that Mr. Doe be awarded custody of the children, child support, use and possession of the family home, a monetary award, and counsel fees.

After filing the divorce action, Mr. Doe inquired as to whether he was, in fact, the father of the three children. Ms. Doe had always acted as though Mr. Doe fathered the children, including having his name placed on their birth certificates. Mr. Doe alleged that he never questioned the paternity of the children until he found Ms. Doe's letter. Both parties agreed that they and the children would submit to blood testing in order to determine paternity. The results of the

tests disclosed that Mr. Doe was the biological father of J.D., but that he was not the biological father of the twins.

Upon receiving the blood test results, Mr. Doe filed an amended complaint for absolute divorce and "other causes of action" in December 1996. In addition to the original count seeking divorce, custody, child support, and relief related thereto, counts II and III of the amended complaint sought damages for fraud and intentional infliction of emotional distress resulting from Ms. Doe's alleged adultery and misrepresentation of the paternity of the children. The amended complaint also included counts IV through VIII, which were based upon Mr. Doe's allegation that Ms. Doe had encouraged him to deposit part of his salary into the couple's joint checking account rather than his 401(k) plan, assuring him that he could rely on her stockholdings for his retirement. The Circuit Court for Baltimore County dismissed counts IV through VIII under Maryland Rule 2–322(b)(2), for failure to state a claim for which relief could be granted. The court also dismissed counts II and III, holding that the asserted causes of action were barred by interspousal immunity and by public policy. The Circuit Court, pursuant to Maryland Rule 2–602(b), entered a final judgment on counts II through VIII.

Upon Mr. Doe's appeal, the Court of Special Appeals affirmed the dismissal of counts IV through VIII but reversed the dismissal of counts II and III. The intermediate appellate court held that neither the doctrine of interspousal immunity nor public policy barred Mr. Doe's causes of action for fraud and intentional infliction of emotional distress. *Doe v. Doe,* 122 Md.App. 295, 712 A.2d 132 (1998). Relying upon its earlier opinion in *Bender v. Bender,* 57 Md.App. 593, 600–602, 471 A.2d 335, 338–339, *cert. denied,* 300 Md. 152, 476 A.2d 721 (1984), the Court of Special Appeals in the present case took the position that this Court in *Lusby v. Lusby,* 283 Md. 334, 390 A.2d 77 (1978), had abolished the defense of interspousal immunity with respect to all intentional tort actions. *See Doe v. Doe, supra,* 122 Md.App. at 322–323, 712 A.2d at 145. Accordingly, the intermediate appellate court held that the causes of action asserted in counts II and III were not

precluded by the doctrine of interspousal immunity. The Court of Special Appeals went on to hold that no other public policy considerations, such as the concern for the best interests of the children or the availability of divorce and marital property remedies, precluded the fraud and intentional infliction of emotional distress causes of action. Finally, the Court of Special Appeals held that the factual allegations in the amended complaint were sufficient to assert causes of action for fraud and intentional infliction of emotional distress.

Ms. Doe, challenging the Court of Special Appeals' holdings as to counts II and III, filed a petition for a writ of certiorari which this Court granted. *Doe v. Doe*, 351 Md. 161, 717 A.2d 384 (1998).

The petitioner argues that the Court of Special Appeals misinterpreted this Court's opinion in *Lusby v. Lusby, supra,* and that the *Lusby* opinion did not abrogate the doctrine of interspousal immunity in all intentional tort actions. According to petitioner, under *Lusby,* interspousal immunity is a defense to the torts asserted in counts II and III because "the present claims carry with them perils of domestic intrusion, a negative impact to the societal concern for the best interest of children, and judicial burden." (Petitioner's brief at 8). The petitioner goes on to argue that additional public policy considerations militate against recognition of the causes of action alleged in counts II and III.

The respondent maintains that the Court of Special Appeals correctly interpreted this Court's opinion in the *Lusby* case. Furthermore the respondent contends that, even if the "no-immunity" holding in *Lusby* was limited to "outrageous" intentional torts, the wrongful conduct alleged in counts II and III meets this standard. The respondent also contends that no other public policy considerations warrant non-recognition of the causes of action asserted in counts II and III. Lastly, the respondent argues that his "right to pursue his tort claims is protected by Article 19" of the Maryland Declaration of

Rights. (Respondent's brief at 39).[1]

## II.

Preliminarily, we shall address the scope of this Court's opinion in *Lusby* and the Court of Special Appeals' interpretation of the *Lusby* opinion.

Prior to *Lusby*, the doctrine of interspousal immunity in tort cases was clearly recognized as part of the common law of this State. This Court stated many years ago: "Maryland w[ould] not entertain a suit by one spouse against the other for his or her tort, committed during the marital status." *Tobin v. Hoffman*, 202 Md. 382, 391, 96 A.2d 597, 601 (1953). *See Stokes v. Taxi Operators Assn.*, 248 Md. 690, 237 A.2d 762 (1968); *Hudson v. Hudson*, 226 Md. 521, 174 A.2d 339 (1961); *Ennis v. Donovan*, 222 Md. 536, 161 A.2d 698 (1960); *Fernandez v. Fernandez*, 214 Md. 519, 135 A.2d 886 (1957); *Gregg v. Gregg*, 199 Md. 662, 87 A.2d 581 (1952); *Riegger v. Bruton Brewing Company*, 178 Md. 518, 16 A.2d 99 (1940); *David v. David*, 161 Md. 532, 157 A. 755 (1932); *Furstenburg v. Furstenburg*, 152 Md. 247, 136 A. 534 (1927).

In *Lusby*, Ms. Lusby brought a tort action for damages against her husband. She alleged that while she was driving, her husband and two accomplices in another vehicle forced her to the side of the road at gunpoint. Her husband then "forcefully and violently" raped her and thereafter assisted the accomplices in attempting to rape her. 283 Md. at 336, 390 A.2d at 77. After reviewing the cases cited above, this Court held that there was nothing in the common law of this State preventing a wife from recovering damages from her husband for the type of outrageous, intentional conduct there involved.

---

1. Article 19 of the Declaration of Rights provides as follows:

   "That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land."

Judge Marvin Smith for the Court set forth the Court's holding as follows (283 Md. at 358, 390 A.2d at 89):

"We find nothing in our prior cases or elsewhere to indicate that under the common law of Maryland a wife was not permitted to recover from her husband in tort when she alleged and proved the type of outrageous, intentional conduct here alleged."

The exception to interspousal immunity applied in *Lusby*, therefore, was explicitly confined to "outrageous" intentional torts. The limited scope of the *Lusby* holding was underscored by this Court's view that nothing in our prior cases, applying interspousal immunity, precluded recovery for the outrageous conduct of the defendant. In *Boblitz v. Boblitz*, 296 Md. 242, 273, 462 A.2d 506, 521 (1983), where the Court did change the common law by abrogating interspousal immunity in *negligence* cases, we reiterated the limited nature of the *Lusby* holding with regard to intentional torts.

The Court of Special Appeals, in *Linton v. Linton*, 46 Md.App. 660, 664, 420 A.2d 1249, 1251 (1980), held that the exception to interspousal immunity under *Lusby* was limited to those intentional torts committed "against the spousal victim" which were "outrageous" and which constituted "atrocious misbehavior." In *Bender v. Bender, supra*, 57 Md.App. at 601–602, 471 A.2d at 339, however, the Court of Special Appeals took the position that this Court, in *Lusby*, "was sanctioning claims for intentional torts and not claims limited to outrageous torts." As the intermediate appellate court stated in the case at bar, *Bender* "[i]mplictly reject[ed] the analysis in *Linton* . . . ." *Doe v. Doe, supra*, 122 Md.App. at 322, 712 A.2d at 145. Following the interpretation of *Lusby* discussed in *Bender*, the Court of Special Appeals held, in the case at bar, that tort interspousal immunity has been entirely abolished in Maryland.

The Court of Special Appeals' interpretation of the *Lusby* opinion in *Bender* and in the present case was erroneous. The holding in *Linton*, that *Lusby* did not abrogate interspousal immunity as to all intentional torts, is correct. As discussed

above, in *Lusby* this Court held that, under the common law of this State, interspousal immunity had never been applied where the conduct alleged was "outrageous" and intentional. *See Lusby,* 283 Md. at 358, 390 A.2d at 89. *See also Hatzini-colas v. Protopapas,* 314 Md. 340, 348 n. 7, 550 A.2d 947 951 n. 7 (1988) (*"Lusby* . . . held that the common law of Maryland had never prevented a wife from suing her husband in tort where the tortious conduct was outrageous and intentional").

The respondent alternatively argues that the conduct alleged in the case at bar is sufficiently "outrageous" to fit within this Court's limited holding in *Lusby.* For the reasons set forth below, however, we need not reach this issue.

### III.

A claim of immunity is a defense. It need be reached only if the plaintiff has alleged a viable cause of action. We shall hold that the actions pled by Mr. Doe in counts II and III are not viable. In those counts, Mr. Doe seeks to recover damages, under different tort labels, for the same type of conduct which formerly gave rise to the common law cause of action known as criminal conversation. That cause of action was designed to provide a remedy for husbands in Mr. Doe's situation. The action, however, has been abolished in this State on constitutional and public policy grounds. *See Kline v. Ansell,* 287 Md. 585, 414 A.2d 929 (1980).

The common law tort of criminal conversation was the civil tort remedy available to a husband when his wife committed adultery.[2] The elements were "a valid marriage and an act of sexual intercourse between a married woman and a man other than her husband." *Kline,* 287 Md. at 587, 414 A.2d at 930. The only valid defense was the consent of the husband. *Kline, ibid.,* citing *Kohlhoss v. Mobley,* 102 Md. 199, 206, 62 A. 236, 236 (1905).

---

**2.** Although the name may seem misleading today, it was logical at the time of its inception. It was " '[c]riminal' because it was an ecclesiastical crime; [and] 'conversation' in the sense of intercourse." Prosser, *Law of Torts* § 124, p. 875 n. 75 (4 th ed.1971).

As this Court discussed in *Kline* with regard to the tort of criminal conversation, "the underlying basis of recovery was the injury to the husband's feelings and particularly to his sense of his own and his family's honor." 287 Md. at 587, 414 A.2d at 930. The particular harms sought to be remedied were the " 'defilement of the marriage bed,' " and a man's right " 'to beget his own children.' " *Kline, ibid.*, quoting *Tinker v. Colwell,* 193 U.S. 473, 484, 24 S.Ct. 505, 507, 48 L.Ed. 754, 759 (1904). In fact, as Blackstone pointed out, the damages recoverable under the common law action, which were "usually very large and exemplary," were often dependent upon "the husband's obligation by settlement or otherwise to provide for those children, which he [could not] but suspect to be spurious." 3 William Blackstone, *Commentaries* 139–140 (1768).

Although married women were not allowed, without being joined by their husbands, to sue or be sued under the common law, in the late 19th century "Married Women's Acts" were passed throughout the country, bestowing upon married women legal rights. Shortly thereafter, courts were forced to review the rationale of the common law action of criminal conversation in order to determine if the right to sue for adultery should be extended to women. Many of these courts, in discussing whether to extend the common law cause of action, held that the "gist of the action was the possibility that by the infidelity of the wife the husband might be called upon to support illegitimate children, or the legitimacy of his own offspring be cast into doubt." *Oppenheim v. Kridel,* 236 N.Y. 156, 160, 140 N.E. 227, 228 (1923). *See Kroessin v. Keller,* 60 Minn. 372, 62 N.W. 438 (1895) (refusing to extend the action to women and discussing the common law's purpose of providing redress to husbands who are forced to raise children of questioned legitimacy).

Under earlier Anglo–Saxon law, inheritance, as well as social standing, was largely dependent upon the "lawful issue of pure blood." Lippman, *The Breakdown of Consortium,* 30 Col. L.Rev. 651, 655 (1930). As Lippman points out (*ibid.*),

"[i]t is not likely that adultery was frowned upon for moral reasons, but because of the importance of pedigree. Legitimacy of offspring was something to insure, and for that reason the wife alone was punished for adultery."

Dean Prosser summarized the rationale of the action when he said that "the real basis of recovery clearly is the defilement of the marriage bed, the blow to family honor, and the suspicion cast upon the legitimacy of the offspring." Prosser, *Law of Torts* § 124, p. 875 (4th ed.1971).

At the time when the tort of criminal conversation first evolved, the possibility of children as a consequence of adultery was even more likely than it is today, considering modern developments in birth control and the growth in scientific knowledge concerning conception. In addition, husbands were unable to determine actual paternity unless they could rule out their own. The tort action of criminal conversation was the remedy provided under the law for these problems. The husband was awarded monetary damages to compensate him for his emotional, as well as financial, injuries, especially when children were involved. Although the birth of children and the corresponding possible misrepresentation of their paternity were not necessary elements of the tort, they were clearly among the injuries for which damages could be recovered. The common law criminal conversation cause of action envisioned the exact conduct, and the same injuries, as those alleged in the case at bar.

Beginning in the 1930's, public resentment began to grow against criminal conversation as well as other "amatory" actions, such as alienation of affections and breach of promise to marry. This resentment led to legislative reform, with the enactment of "Heart Balm Acts" throughout the country. In 1935 Indiana was the first state to enact such a law, abolishing "all civil causes of action for breach of promise to marry, for alienation of affections, [and] for criminal conversation." Ch. 208 of the Indiana Acts of 1935, § 1, presently codified as Indiana Code Annotated § 34–12–2–1 (1999). The majority of states soon followed, abolishing amatory torts either by statute or by judicial decision.

In Maryland, the General Assembly abolished the actions of alienation of affections and breach of promise to marry in 1945, citing problems of blackmail, extortion, and fraud often encountered when such claims were brought. *See* Ch. 1010 of the Acts of 1945. Criminal conversation, which was recognized in Maryland at least as early as 1828, *see Fornshill v. Murray*, 1 Bland 479, 482 (1828), remained a viable cause of action until 1972, when Article 46 of the Maryland Declaration of Rights, often referred to as the Equal Rights Amendment (ERA), was adopted.[3] This Court, in *Kline v. Ansell, supra*, 287 Md. 585, 414 A.2d 929, held that the cause of action violated the ERA.

As previously discussed, the common law criminal conversation action was available only to men. As a result, in *Kline*, this Court was faced with the choice of expanding the cause of action to women so that the tort would not violate the ERA, or abolishing it in its entirety for violating the ERA. Based upon public policy grounds similar to those cited by the General Assembly in abolishing the actions for alienation of affections and breach of promise to marry, this Court chose to abolish the action for criminal conversation.

Mr. Doe's causes of action asserted in counts II and III differ from the tort of criminal conversation in that the defendant in this case is his wife rather than her paramour. The paramour was the named defendant under the common law criminal conversation action, not because the wife was deemed a non-tortfeasor, but because a married woman could not sue or be sued *by anyone* without having her husband joined in the action. *See* Prosser, *supra*, § 123 at 870. Regardless of whether Mr. Doe is suing Ms. Doe or her paramour, his asserted causes of action are based on the same conduct that formerly gave rise to a criminal conversation action, and he seeks damages for the same injuries recognized in a criminal conversation action. Consequently, the identical

---

**3.** Article 46 of the Declaration of Rights states as follows:

"Equality of rights under the law shall not be abridged or denied because of sex."

public policy considerations, which led to the abolition of criminal conversation, are applicable here.

Courts elsewhere have held that tort actions, regardless of label, based upon adultery and misrepresentation of paternity, are barred by the same public policy which led to the abolition of the action for criminal conversation. In *Koestler v. Pollard*, 162 Wis.2d 797, 471 N.W.2d 7 (1991), a husband brought an action against his wife's paramour for intentional infliction of emotional distress. The husband alleged that the paramour knew that he (the paramour) was the father of a child born during the marriage, but that he did not reveal the truth until the husband had developed a close relationship with the child. The Supreme Court of Wisconsin held that the husband's claim was barred by the state legislature's abolition of the action for criminal conversation. The court held that "allowing [such claim would] result in many of the evils which occurred when claims for criminal conversation were allowed." *Koestler*, 162 Wis.2d at 809, 471 N.W.2d at 12.

The Supreme Court of Nebraska, in *Speer v. Dealy*, 242 Neb. 542, 495 N.W.2d 911 (1993), barred a husband's claim of intentional infliction of emotional distress against his wife's paramour, holding that tort causes of action based upon adultery were contrary to the legislature's intent in abolishing actions for alienation of affections and criminal conversation.

In *Weicker v. Weicker*, 22 N.Y.2d 8, 290 N.Y.S.2d 732, 237 N.E.2d 876 (1968), a wife sued her husband and his paramour for "intentional infliction of mental distress," alleging that the husband obtained an invalid Mexican divorce, purported to marry his paramour, and that he and the paramour had held themselves out as husband and wife even though they were never legally married. The Court of Appeals of New York affirmed the dismissal of the wife's action, holding that allowing the action, which was based on adultery, "would result in a revival of evils not unlike those which prompted the Legislature in 1935 to outlaw actions for alienation of affections and criminal conversation." *Weicker*, 22 N.Y.2d at 11, 290 N.Y.S.2d 732, 237 N.E.2d at 877.

These "evils" and the public policy concerns justifying the abolition of the action for criminal conversation were summarized for this Court by Judge Davidson in *Kline* (287 Md. at 588–589, 414 A.2d at 931):

"The action for criminal conversation is notorious for affording a fertile field for blackmail and extortion because it involves an accusation of sexual misbehavior.... An award of damages does not constitute an effective deterrent to the act of adultery, and it does not effectively help to preserve or restore a marital relationship in which adultery has already occurred.... Most important, today's sense of the increasing personal and sexual freedom of women is incompatible with the rationale underlying this action. For all of these reasons, this harsh cause of action has been considered to be unreasonable and anachronistic."

In addition, as observed by the Supreme Court of Wisconsin in *Koestler*, there are some harms for which the law cannot, and should not, provide a remedy. *Koestler v. Pollard, supra,* 162 Wis.2d at 808, 471 N.W.2d at 11, citing *Richard P. v. Superior Court,* 202 Cal.App.3d 1089, 1093–1094, 249 Cal.Rptr. 246, 249 (1988). The facts of *Richard P.* are similar to the facts of the case at bar, as well as those in *Koestler*: a husband brought actions for fraud and intentional infliction of emotional distress against his wife's paramour. The husband alleged that the paramour willfully concealed the true paternity of children born during the marriage until the husband and those children had "emotionally bonded." *Richard P.,* 202 Cal.App.3d at 1092, 249 Cal.Rptr. at 248. The California court held that the husband's claim was barred by the public policy of the state. The court recognized that the "lawsuit emanated from an unhappy situation in which the real parties in interest suffered grief." 202 Cal.App.3d at 1093–1094, 249 Cal.Rptr. at 249. Nevertheless, the court held that, because of the subject matter of the action, it was inappropriate for the courts to intervene by allowing the tort action, stating that the judiciary does not have the ability "to remedy all human wrongs." *Ibid.*

If we were to allow Mr. Doe's alleged causes of action in counts II and III, the tort of criminal conversation would be

revived through "artful pleading." *Koestler,* 162 Wis.2d at 805, 471 N.W.2d at 10. This Court decided twenty years ago that public policy would not allow tort damages based upon adultery. *See Kline,* 287 Md. 585, 414 A.2d 929. That decision should not be ignored simply because the plaintiff has employed different labels and named a different defendant.

The facts of this case are distinguishable from those in *Figueiredo–Torres v. Nickel,* 321 Md. 642, 584 A.2d 69 (1991), where the conduct alleged included an element wholly extraneous to the common law tort of criminal conversation. In *Figueiredo–Torres,* the husband brought an action against his wife's paramour, a licensed psychologist who allegedly began the affair while acting in a professional capacity as marriage counselor for both the husband and the wife. The husband alleged that the psychologist had committed professional malpractice and had intentionally inflicted emotional distress upon him. This Court held that the claims were not barred by the abolition of actions for alienation of affections and criminal conversation because of the professional malpractice involved. The identity of the paramour, and his relationship with the husband and wife, are what distinguish *Figueiredo–Torres* from the case at bar. We made clear in *Figueiredo–Torres* that "a psychologist-patient relationship falls squarely into the category of relationships which are carefully scrutinized by the courts." 321 Md. at 654, 584 A.2d at 75. The conduct of the psychologist in *Figueiredo–Torres,* "with whom [the husband] enjoyed a special relationship ... constitute[d] more than the abolished amatory causes of action." 321 Md. at 657, 584 A.2d at 77. Unlike the husband in *Figueiredo–Torres,* Mr. Doe has failed to allege facts sufficient to distinguish his alleged tort actions from the abolished tort of criminal conversation.

### IV.

Finally, we hold that the respondent's reliance upon Article 19 of the Maryland Declaration of Rights is misplaced.

██ Article 19 insures that rights belonging to Marylanders are "not illegally or arbitrarily denied by the govern-

ment." *State v. Board of Education,* 346 Md. 633, 647, 697 A.2d 1334, 1341 (1997). Furthermore, under Article 19, "a plaintiff injured by unconstitutional state action should have a remedy to redress the wrong." *Ashton v. Brown,* 339 Md. 70, 105, 660 A.2d 447, 464–465 (1995). *See Weyler v. Gibson,* 110 Md. 636, 653–654, 73 A. 261, 263 (1909). Moreover, even with regard to causes of action not based upon constitutional violations, "Article 19 does guarantee access to the courts." *Johnson v. Maryland State Police,* 331 Md. 285, 297, 628 A.2d 162, 168 (1993). *See also, e.g., Renko v. McLean,* 346 Md. 464, 484, 697 A.2d 468, 478 (1997); *Murphy v. Edmonds,* 325 Md. 342, 365, 601 A.2d 102, 113 (1992); *Whiting–Turner Contracting Co. v. Coupard,* 304 Md. 340, 360, 499 A.2d 178, 189 (1985). Nonetheless, as those cases emphasize, " 'that access [to the courts] is subject to reasonable regulation.' " *Renko,* 346 Md. at 484, 697 A.2d at 478. *See Johnson,* 331 Md. at 297, 628 A.2d at 168 (a " 'restriction upon access to the courts violates Article 19 only if the restriction is unreasonable' "); *Murphy,* 325 Md. at 365, 601 A.2d at 113 (same); *Whiting–Turner,* 304 Md. at 360, 499 A.2d at 189 ("the test for determining whether access to the courts had been denied in violation of art. 19 look[s] to the reasonableness of the restriction").

■ Turning to the facts alleged in the present case, Maryland law has never recognized a tort cause of action by a husband against his wife based upon the type of conduct here involved. Consequently, our refusal to recognize such cause of action today does not deprive a plaintiff in John Doe's position of any access to the courts which previously existed. Moreover, this Court has specifically held that restrictions upon intra-family tort actions are not unreasonable under Article 19. *Renko v. McLean, supra,* 346 Md. at 484, 697 A.2d at 478 ("the parent-child immunity doctrine is a reasonable and well-founded limitation upon a child's access to our courts").

It is true that, prior to 1972 when Article 46 of the Declaration of Rights (the ERA) became part of the Maryland Constitution, a man in John Doe's position could maintain a tort

action against his wife's paramour based upon the type of conduct alleged here. Nevertheless, the abolition of a common law cause of action, on the ground that the cause of action violates a recent amendment to the Maryland Constitution, could hardly be deemed an unreasonable restriction upon access to the courts.

## V.

The public policy of this State, reflected in the abolition of the actions for alienation of affections and criminal conversation, required the dismissal of the tort actions asserted in this case.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY. RESPONDENT TO PAY THE COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.*