This is an action of ejectment brought by the appellant against the appellee, on the 4th day of May, 1920, in the Superior Court of Baltimore City, to recover possession of two lots or strips of land, described as parts or the portions of the beds of Harper Street and David Alley situate between Fort Avenue and McComas Street, in the City of Baltimore.
The case was tried, on issue joined upon the plea of not guilty, before the court without a jury, and from a judgment in favor of the defendant for costs, the plaintiff has taken this appeal.
The record contains but a single exception and that is to the rulings of the court upon the prayers.
The court below granted the plaintiff's third and fourth prayers, and his second prayer, in connection with the defendant's fifth prayer, but refused his first prayer. The defandant's first, second, third and fourth prayers were refused, but its fifth prayer was granted, in connection with the plaintiff's second prayer. The plaintiff's second prayer and the defendant's fifth prayer will be set out by the Reporter, in his report of the case.
The plaintiff, it will be seen, excepted to the action of the court in granting the defendant's fifth prayer and the plaintiff's second prayer in connection with the defendant's fifth prayer, and in refusing the plaintiff's first prayer and his second prayer, as offered, and in overruling his special objection to the defendant's fifth prayer, and this constitutes the basis of the only exception contained in the record on this appeal.
The declaration avers that the plaintiff, being the owner, was in possession of the following described property, in the City of Baltimore, at the time of the institution of this suit, to wit:
Lot 1. — Beginning for the same at a point formed by the intersection of the northeasternmost side of McComas Street *Page 312 
and the northwesternmost side of Harper Street and running thence northeasterly and binding on the said northwesternmost side of Harper Street 1,117 feet to the southwesternmost side of Fort Avenue; thence southeasterly and binding on the said southwesternmost side of Fort Avenue 66 feet to the southeasternmost side of Harper Street; thence southwesterly and binding on the said southeasternmost side of Harper Street 1,117 feet to the northeasternmost side of McComas Street; thence northwesterly and binding on the said northeasternmost side of McComas Street 66 feet to the place of beginning.
Lot 2. — Beginning for the same at a point formed by the intersection of the northeasternmost side of McComas Street and the northwesternmost side of David Street, and running thence northeasterly and binding on the said northwesternmost side of David Street 1,117 feet to the southwesternmost side of Fort Avenue; thence southeasterly and binding on the said southwesternmost side of Fort Avenue 20 feet to the southeasternmost side of David Street; thence southwesterly and binding on the said southeasternmost side of David Street 1,117 feet to the northeasternmost side of McComas Street; thence northwesterly and binding on the said northeasternmost side of McComas Street 20 feet to the place of beginning.
The two lots being what was formerly the beds of Harper Street and David Street (otherwise known as David Alley), as the same appeared on a certain plat of the same signed by John Glenn and Robert Purviance, Jr., trustees, and recorded among the Land Records of Baltimore City, State of Maryland, in Liber E.D. 57, folio 345.
And the defendant, a corporation duly incorporated under the laws of the State of Maryland, did wrongfully enter the parcel or parcels of land and eject him, the plaintiff, therefrom, and the defendant ever since has retained, and still retains possession of the lots or parcels of land, and other wrongs to the plaintiff then and there did, to his great damage. *Page 313 
The plaintiff, then, claims the recovery of the parcels of land and damages for its detention.
The facts of the case are practically undisputed, and the prominent question presented for our consideration, as stated by the appellee in its brief, is whether, on the facts contained in the record, there was evidence legally sufficient to justify the court in submitting to itself as a jury, the question, whether or not the defendant had acquired title to the land here in controversy by adverse possession, as presented by the defendant's fifth prayer.
This prayer (the defendant's fifth) instructed the court that if it should find from the evidence that the defendant (or those under whom it claims) has been in adverse, continuous and exclusive possession of the land in controversy for twenty years or more before the institution of this suit, then the plaintiff is not entitled to recover.
The plaintiff's contention and his theory of the case was submitted by his second prayer, which set out the facts relied upon by him for a recovery, and the court, sitting as a jury, was instructed, if it should find from the evidence the facts stated in the prayer, then the plaintiff was entitled to recover, and to be awarded such damages as in the opinion of the court might be a fair and reasonable compensation to the plaintiff for the defendant's use and occupation of the premises.
It is clear, we think, that the evidence in this case was legally sufficient to be submitted to the court, sitting as a jury, to show title to the property in question by adverse possession in the defendant, and the court committed no error in granting the defendant's fifth prayer, nor was there error in granting the plaintiff's second prayer in connection with the defendant's fifth prayer.
The principles of law, to establish a title by adverse possession, have been stated and settled by numerous decisions of this court, among which are: Sowers v. Keedy, *Page 314 135 Md. 450; Bowie v. Western Md. R.R. Co., 133 Md. 2; Hanson v.Johnson, 62 Md. 25.
The uncontradicted evidence disclosed by the record, in this case, tends to show that the possession by the defendant of the lands here in question, has been continuous, open, adverse and exclusive, for a period of over twenty years.
The witness Metzger testified that he had been in the employ of the defendant since the latter part of the year 1870; that he worked in the year 1872 in the Locust Point Yards of the defendant south of Fort Avenue; that a carpenter shop and other buildings south of Fort Avenue, and a tobacco warehouse north of Fort Avenue, were built thereon in the year 1880; that he understands thoroughly the area of the Locust Point Yard of the defendant, that it is bounded on the north by Fort Avenue, on the east by several buildings — a carpenter shop, warehouse, etc., and on the south and west by water or swampy ground; that at that time there were no streets running either north, south, east or west, in that area; that when he first began working in the area in question, in the Locust Point Yard, there was no fence there, but a fence was built when the lumber yard was put there, about 1886; that in the lumber yard there were tracks and the tracks were between the fence and the shop buildings; that the fence ran from a point on the south side of Fort Avenue, about seventy feet west of the tobacco warehouse, as far south as the main tracks or Claggett Street. He further testified that the lumber yard is between the fence, which is about seventy feet west of the tobacco warehouse and south of Fort Avenue and the shop buildings shown on the blueprint, and runs from Fort Avenue south as far as the main line; that late in the '70s there was a main track and siding running in Claggett Street; that at a point about opposite the area in question and south of the main line, or Claggett Street, these tracks branched out into six tracks running out to the water; that these tracks are not so located at the present *Page 315 
time, and that the blueprint shows these tracks as being straight lines running east and west, but that in the late '70s these tracks, opposite the area in question, opened like a fan and ran southeast and southwest to the water; that at the same time the portion of the area west of the fence had dump tracks on it, that is one or two some times, and that dirt and earth were dumped in there; that these dump tracks ran from the main track towards Fort Avenue, and west of the fence in question; that these dump tracks were placed there about 1889, in along there; that during all these years the only use of the area was by the Baltimore 
Ohio Railroad, which had a fence in one place to keep people out.
The witness Lang testified as follows: that he is at present a car inspector for the defendant, but that he used to be a car repairman, and as such went to work in Locust Point Yard in 1886; that he still works at this place; that his work in the '80s was on the repair tracks in Locust Point Yard west of the buildings, such as carpenter shed, oil house, etc., etc.; that his work did not take him south of the main tracks, but right in front of the buildings in question and in the yard at that place; that in the '80s this yard, at the point in question, ran from the shop buildings as far west as the fence, which fence was about forty or fifty feet west of the tobacco warehouse; that he remembers the location of the fence because the tobacco warehouse was on the north side of Fort Avenue and about thirty feet to the west of it there was a restaurant, and the fence was about fifteen feet to the west of this latter building, the buildings being on the north side of Fort Avenue and the fence and railroad yard being on the south side; that he remembers that the Baltimore 
Ohio Railroad used to dump dirt in the pond or swamp west of the fence as far back as 1900, but that his memory on this does not run back any further; that about 1886 there were seven tracks in the railroad yard between the fence and the shop buildings and that by 1890 these had been increased until *Page 316 
there were thirteen tracks which filled the entire space between the fence and the carpenter building, so that there was no room for any other tracks, and that these tracks ran from Fort Avenue south to the main line tracks.
The witness Biddle testified that he was connected with the Appeal Tax Court of Baltimore; that the City of Baltimore has a plat book which shows property between Fort Avenue on the north, Patapsco River on the south, Steuart Street on the east and Prosser Street on the west; that this whole area which includes Harper Street and David Alley was assessed in 1897 to the Baltimore Ohio Railroad Company, and that the said area has been, since that date, continuously so assessed; that this whole locality is called "Lot 1"; that this assessment included everything within that area.
It will be thus seen, from the testimony here set out, and the other evidence disclosed by the record, that the property, with the exception of the land described as the beds of Harper Street and David Alley, was acquired by the defendant between the years 1869 and 1880. The defendant in 1880 located a lumber yard, on the bed of Harper Street, between Fort Avenue and Claggett Street. Dump tracks were laid upon the bed of David Alley between Fort Avenue and Claggett Street, in 1890, by the defendant, from which cars of dirt and rubbish were emptied. In 1870, six additional tracks were laid by the defendant over those parts of Harper Street and David Alley, south of Claggett Street to the water's edge.
The undisputed evidence shows that the land in question was never used as streets and that the streets were never accepted by the City as such.
The ordinances of 1919, which authorized their closing, and relied upon by the appellant, were passed more than thirty years after complete occupancy by the defendant had begun and the defendant had acquired a valid title by adverse possession under the statute. Howard et al. v. West. *Page 317 Md. R.R. Co., Jan'y Term, 1921; Corpus Juris, Vol. 2, 223;Tiffany's Real Property, Vol. 2, 1920; Weyler v. Gibson etal., 110 Md. 636; Cox v. Forrest, 60 Md. 74; Sanderson v.M. C.C. of Balto., 135 Md. 509.
We think there was evidence legally sufficient to justify the court in submitting this case, to the court, sitting as a jury, and as we find no error in the rulings of the court on the prayers, the judgment will be affirmed.
Judgment affirmed, with costs. *Page 318