DIANA R. LUSBY *v.* GERALD LEE LUSBY ET AL.

[No. 167, September Term, 1977.]

*Decided July 19, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE, ORTH and COLE, JJ.

*Theodore L. Mast,* with whom were *Bill L. Yoho, Stephen H. Kiefert, Martin C. Dennis, Robert S. Hoyert* and *Hoyert & Yoho* on the brief, for appellant.

*Joseph H. Rouse* for appellee.

SMITH, J., delivered the opinion of the Court.

We shall here hold that under the facts and circumstances of this case, amounting to an outrageous, intentional tort, a wife may sue her husband for damages — a holding which represents somewhat of a departure from the earlier decisions of this Court.

Appellant, Diana R. Lusby (the wife), brought an action in the Circuit Court for Prince George's County against John Doe, Richard Roe, and Gerald Lee Lusby (the husband). She alleged that while she was operating her motor vehicle on a public highway the husband "pulled alongside of [her] in his pick-up truck and pointed a highpowered rifle at her." She attempted to flee by increasing the speed of her car. She claimed that then "another truck occupied by two (2) men, whose identities are unknown to [her] and who, [t]hereinafter are referred to [in the declaration] as John Doe and Richard Roe, cut and forced her off the road, nearly causing a collision." (Counsel for the wife directed that no summons be issued for Messrs. Doe and Roe until such time as specific directions were received from counsel. Summons has never been issued.) After she stopped her car, the husband

"approached her automobile with a rifle pointed at her, opened her left door, ordered her to move over, forced his way into the automobile and began to drive the automobile." They were followed by Doe in the husband's truck and Roe in the second truck. Thereafter, the wife "was forced to enter [the husband's] truck with [the husband] and Richard Roe." John Doe drove the wife's vehicle and the second truck was left parked. She alleged that her husband then struck her, "tore [her] clothes off and did forcefully and violently, despite [her] desperate attempts to protect herself, carnally know [her] against her will and without her consent." She further claimed that, with the aid and assistance of her husband, both Doe and Roe attempted to rape her. She said that following those events her husband "and his two companions released [her] and [her husband] told [her] that he would kill her if she informed anyone of the aforesaid events; and that he has continued to harass and threaten [her]."

The husband demurred to the declaration on several grounds including the fact that the parties were married at the time and that, notwithstanding Maryland Code (1957, 1971 Repl. Vol., 1975 Cum. Supp.) Art. 45, § 5, Maryland "law is unequivocal . . . that a husband and a wife, as the case may be, may not sue the other for a tort committed by the other upon and/or against his or her person; this is a principle that dates from the common law." The circuit court judge who considered the matter overruled the demurrer, saying that "[n]o facts [were] asserted [in the declaration] leading to the conclusion that plaintiff and defendant are in any way related."

The husband then adopted another tactic. He filed a motion raising preliminary objection pursuant to Maryland Rule 323, pointing specifically to Rule 323 a 5 providing that lack of legal capacity to sue on the part of the plaintiff is a defense which constitutes grounds for a motion raising preliminary objection.[1] He then asserted "[t]hat since the Plaintiff and

1. We do not have before us in this case the question of whether the issue here presented was one which might properly be raised under Maryland Rule 323 a 5, nor do we have presented the question of whether the motion was seasonably filed.

Defendant were lawfully married on February 16, 1976, [the date of the alleged incident,] the Plaintiff does not have the legal capacity to sue her husband." Another trial judge granted that motion and a judgment for costs was entered against the wife in favor of the husband. An appeal was then filed to the Court of Special Appeals. We granted certiorari prior to the consideration of the appeal by that court.

The disabilities formerly existing insofar as women are concerned are difficult for those of us of the present generation to fully comprehend.[2] It seems hard to believe that prior to the adoption of the 19th Amendment of the Constitution of the United States in 1920 women were not permitted to vote in Maryland and many other states. Prior to the enactment of Chapter 399 of the Acts of 1902 they were not permitted to practice law in Maryland. *See In Re Maddox,* 93 Md. 727, 50 A. 487 (1901). Deeds are to be found among the land records of some of our counties in which acknowledgments appear referring to the examination of the wife out of the presence of her husband by the person taking the acknowledgment.

Judge Richard Grason in *Barton v. Barton,* 32 Md. 214, 224 (1870), is authority for the fact that at common law "a debt due by the husband to the wife for money lent before marriage, became extinguished by the marriage." In that case he said for the Court:

> "[P]ublic policy, originating in the delicate relation existing between husband and wife, forbids a wife from maintaining an action at law against her husband during the coverture, and her only remedy against him is by a proceeding in equity." *Id.* at 224.

In *David v. David,* 161 Md. 532, 534, 157 A. 755 (1932), Judge Offutt said for the Court, "The rule at common law is that a married woman cannot maintain an action against her husband for injuries caused by his negligent or tortious act. 30 *C.J., 'Husband and Wife,'* secs. 317, 675." He went on to

---

2. Under Maryland Declaration of Rights, Art. 46, providing that "[e]quality of rights under the law shall not be abridged or denied because of sex," many of the disabilities which existed at common law would not be permitted today.

say, referring to the same citation and also to *Philips v. Barnet,* 1 Q.B.D. 436 (1876), that "[t]he reason usually given for that rule is the presumed legal identity of the husband and wife . . . ." Background for this is found in 1 W. Blackstone, *Commentaries* some 200 years ago:

> "By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband: under whose wing, protection, and *cover,* she performs everything; and is therefore called in our law-french a *feme-covert, foemina viro co-operta;* is said to be *covert-baron,* or under the protection and influence of her husband, her *baron,* or lord; and her condition during her marriage is called her *coverture.* Upon this principle, of a union of person in husband and wife, depend almost all the legal rights, duties, and disabilities, that either of them acquire by the marriage." *Id.* at \*442 (italics in original).

He adds, in discussing the consequences of this union of husband and wife, "If the wife be injured in her person or her property, she can bring no action for redress without her husband's concurrence, and in his name, as well as her own: neither can she be sued without making the husband a defendant." *Id.* at \*443.

It is hard to comprehend in this day and age that in an earlier time a husband had a right to give "correction" to his wife. Blackstone states:

> "The husband also, by the old law, might give his wife moderate correction. For, as he is to answer for her misbehavior, the law thought it reasonable to intrust him with this power of restraining her, by domestic chastisement, in the same moderation that a man is allowed to correct his apprentices or children; for whom the master or parent is also liable in some cases to answer. But this power of correction was confined within reasonable bounds, and the

husband was prohibited from using any violence to his wife, *aliter quam ad virum, ex causa regiminis et castigationis uxoris suae, licite et rationabiliter pertinet.* The civil law gave the husband the same, or a larger, authority over his wife: allowing him, for some misdemeanors, *flagellis et fustibus acriter verberare uxorem* [to beat his wife severely with scourges and cudgels]; for others, only *modicam castigationem adhibere* [to use moderate chastisement]. But with us, in the politer reign of Charles the Second, this power of correction began to be doubted; and a wife may now have security of the peace against her husband; or, in return, a husband against his wife. Yet the lower rank of people, who were always fond of the old common law, still claim and exert their ancient privilege: and the courts of law will still permit a husband to restrain a wife of her liberty, in case of any gross misbehavior.

"These are the chief legal effects of marriage during the coverture; upon which we may observe, that even the disabilities which the wife lies under are for the most part intended for her protection and benefit: so great a favorite is the female sex of the laws of England." *Id.* at *444-45.

Our laws relative to women were completely revised by Chapter 457 of the Acts of 1898. Maryland Code (1957, 1971 Repl. Vol., 1977 Cum. Supp.) Art. 45, § 5 reads today exactly as it was enacted in 1898 except for amendments in 1973 and 1975 not relevant to this proceeding. That section provides in pertinent part:

"Married women shall have power to engage in any business, and to contract, whether engaged in business or not, and to sue upon their contracts, and also to sue for the recovery, security or protection of their property, and for torts committed against them, as fully as if they were unmarried; contracts may also be made with them, and they may also be

sued separately upon their contracts, whether made before or during marriage, and for wrongs independent of contract committed by them before or during their marriage, as fully as if they were unmarried; and upon judgments recovered against them, execution may be issued as if they were unmarried; nor shall any husband be liable upon any contract made by his wife in her own name and upon her own responsibility, nor for any tort committed separately by her out of his presence, without his participation or sanction."

Two years later the General Assembly added what is now Code (1957) Art. 45, § 20:

"A married woman may contract with her husband and may form a copartnership with her husband or with any other person or persons in the same manner as if she were a feme sole, and upon all such contracts, partnership or otherwise, a married woman may sue and be sued as fully as if she were a feme sole."

In *Furstenburg v. Furstenburg,* 152 Md. 247, 136 A. 534 (1927), the Court was concerned with a suit by a wife against her husband for injuries sustained in an automobile accident. It was suggested that Art. 45, § 5 permitted such an action. The Court referred to *Thompson v. Thompson,* 218 U. S. 611, 31 S. Ct. 111, 54 L. Ed. 1180 (1910), in which the Supreme Court had construed a similar District of Columbia statute. Our predecessors quoted liberally from the Supreme Court's opinion. That Court said, "The statute was not intended to give a right of action as against the husband, but to allow the wife, in her own name, to maintain actions of tort which at common law must be brought in the joint names of herself and husband." 218 U. S. at 617. It stated that "[i]n no act called to [its] attention ha[d] the right of the wife been carried to the extent of opening the courts to complaints of the

character of the one [t]here involved," the action being one for assault. The Supreme Court then said:

> "It must be presumed that the legislators who enacted this statute were familiar with the long-established policy of the common law, and were not unmindful of the radical changes in the policy of centuries which such legislation as is here suggested would bring about. Conceding it to be within the power of the legislature to make this alteration in the law, if it saw fit to do so, nevertheless such radical and far-reaching changes should only be wrought by language so clear and plain as to be unmistakable evidence of the legislative intention. Had it been the legislative purpose not only to permit the wife to bring suits free from her husband's participation and control, but to bring actions against him also for injuries to person or property as though they were strangers, thus emphasizing and publishing differences which otherwise might not be serious, it would have been easy to have expressed that intent in terms of irresistible clearness." 218 U. S. at 618.

Our predecessors found themselves "fortified ... by an indication in the enactment and provisions of a later statute," referring to the present § 20, as indicating that § 5 "was not intended to be as broad and unqualified" as was suggested to the Court by the appellant there. Judge Urner said for the Court that the present § 20 "would have been a wholly superfluous act if the Legislature had understood and intended that under the Act of 1898 a wife was entitled to sue her husband for breach of contract." The Court concluded that "the purpose of the Act of 1898 [was] to give the wife a remedy, by her suit alone, for actionable wrongs which could not theretofore be thus independently redressed," saying that an "intention to create, as between husband and wife, personal causes of action, which did not exist before the act, [was] not, in [the Court's] opinion, expressed by its terms."

The issue was next before the Court in *David v. David, supra,* 161 Md. 532, when a wife sustained personal injuries on business premises in Baltimore City and sued the owners, a partnership of which her husband was a member. There Judge Offutt said for the Court:

> "The same dictates of public policy which have been held to preclude persons who stand in the relation of husband and wife from suing each other individually in tort would also prevent either of them from maintaining such an action against a partnership of which the other was a member, nor is the vestigial legal identity of the husband and wife remaining after the Married Women's Act, which the court in *Furstenburg v. Furstenburg, supra,* recognized as sufficient to prevent an action in tort by a wife against her husband, affected by the fact that the husband is sued only as a member of a partnership." *Id.* at 538.

In *Riegger v. Brewing Company,* 178 Md. 518, 16 A. 2d 99 (1940), the wife sought to sue her husband's employer on the theory that he stood responsible for her husband's negligence. Relying upon *David,* the Court said this was not permissible.

In *David* the Court referred to:

> "[t]he adoption of legislation which has had the effect of partially dissipating [the] fiction [of the presumed legal identity of the husband and wife], by permitting suits between husband and wife to enforce contractual liabilities, by according to each the same rights and privileges in respect to property they would have if unmarried, by permitting the wife to carry on a trade or business, and to receive and enjoy her earnings from any source as freely as if single, and to sue in her own name for torts against her." 161 Md. 534-35.

The Court then referred to the fact that "there ha[d] been a determined effort to have [such legislation] construed so as

to permit actions between husband and wife for damages resulting from some wrongful or negligent act of the defendant, and in some jurisdictions it ha[d] been so construed [, citing cases,] usually on the ground that, with the disappearance of the fiction of identity, the reason for the rule denying persons in the relation of husband and wife the right to sue each other in tort ceased." The Court then said:

> "But that view has been rejected by what seems to be the weight of authority, not only upon the technical and artificial ground that the identity of husband and wife persists in its original vigor *until it has been completely dissolved by express legislative mandate, in respect to all matters which the Legislature has not expressly included within the meaning of the emancipatory statutes,* but upon the broader sociological and political ground that it would introduce into the home, the basic unit of organized society, discord, suspicion and distrust, and would be inconsistent with the common welfare." *Id.* at 535 (emphasis added).

In *Gregg v. Gregg,* 199 Md. 662, 87 A. 2d 581 (1952), after a wife had successfully sued for permanent alimony and counsel fees but failed to obtain reimbursement of sums expended by her for necessaries, she brought a suit at law against her husband for what she claimed to have expended for necessaries subsequent to his desertion but before her alimony suit was filed. A demurrer to the declaration was sustained without leave to amend. This Court affirmed, concluding that, absent an "express mandate from the Legislature to that effect," it was powerless to permit the recovery which was sought, and if "this omission should be repaired, it is for the Legislature, and not for us, to act." In the course of the opinion Chief Judge Marbury quoted for the Court from that portion of *David* above set forth, adding the emphasis which appears above. He then said:

> "This last ground is as artificial as the first. It applies to a post-bellum situation a theory which is clearly only applicable to conditions prior to the

difficulty which caused the bringing of the legal action. After discord, suspicion and distrust have entered the home, it is idle to say that one of the parties shall not be allowed to sue the other because of fear of bringing in what is already there. However, these ancient theories which form a part of the common law have to be followed by us unless they have been changed by legislative action, and the clear import of the decision in the *David* case is that the emancipatory statutes must be strictly construed. The Legislature has not amended or changed this emancipatory legislation since 1931, when the *David* case was decided." *Id.* at 666-67.

*Tobin v. Hoffman,* 202 Md. 382, 96 A. 2d 597 (1953), involved an application of District of Columbia law. However, Chief Judge Sobeloff said for the Court at 391, "It is clear that Maryland will not entertain a suit by one spouse against the other for his or her tort, committed during the marital status," citing *Furstenburg* and *David.*

In *Fernandez v. Fernandez,* 214 Md. 519, 135 A. 2d 886 (1957), a wife, living apart from her husband, sued in replevin to recover certain chattels. Judge Hammond referred for the Court to *Furstenburg, David,* and *Riegger* and their explicit holding "that the Act did no more than authorize a married woman to prosecute suits at law in her own name as if unmarried against a third person." However, although refusing to permit such an action at law because of those prior decisions unless they were to be overruled, the Court acknowledged that "[t]he literal language of the Act authorizes both [a right to sue her husband for tort against her person] and [a right to sue him for a tort against her property interest], as well as a right to sue him in contract." The suit was remanded for transfer to the equity side of the docket, with the comment that in such situations a spouse "must proceed in equity until the Legislature sees fit to change the law."

The issue was again before the Court in *Ennis v. Donovan,* 222 Md. 536, 161 A. 2d 698 (1960). In that instance a surviving

husband brought suit against the operator of a vehicle allegedly responsible for the death of his wife. The defendant filed a third-party claim against the husband to which demurrers were filed because the third-party action could only be maintained if the wife could have sued her husband had she lived. After reviewing our prior cases, Judge Prescott said for the Court:

> "From what we have said above, it is seen that this Court has flatly held that a married woman had no common-law right to sue her husband for injuries suffered by her as the result of his negligence, and, the Legislature has not yet seen fit to grant her such a right. It has also stated that if this disability is to be removed, it must be done by the law-making branch of the government. We can only repeat that if it be desirable to permit a married woman, under certain circumstances, to sue her husband in tort, this authorization should emanate from the Legislature, not from the courts." *Id.* at 542-43.

In *Hudson v. Hudson,* 226 Md. 521, 174 A. 2d 339 (1961), the Court was faced with the issue of whether a wife might maintain an action against her husband to recover for personal injuries allegedly sustained as a result of his negligent operation of a motor vehicle prior to their marriage. Judge Prescott again reviewed our prior cases and said for the Court, "we feel impelled to follow our previous decisions (and the great majority of jurisdictions elsewhere) and to hold that the wife's cause of action was extinguished upon her marriage to the defendant . . . ."

The issue was last considered by this Court in *Stokes v. Taxi Operators Assn.,* 248 Md. 690, 237 A. 2d 762 (1968), where a wife, a paying passenger in a taxicab operated by her husband, sought to recover from his employer for the injuries she sustained as the result of her husband's negligent operation of the cab. The Court found *Riegger,* 178 Md. 518, to be controlling. It said that there was a split of authority on the question, with the jurisdictions allowing recovery in such situations exemplified by *Schubert v. Schubert Wagon*

*Co.,* 249 N. Y. 253, 164 N. E. 42 (1928), and *Fields v. Synthetic Ropes, Inc.,* 215 A. 2d 427 (Del. 1965).[3] It said in the jurisdictions which deny recovery *Riegger* is one of the leading cases. In response to a contention that the Court "should now follow the rationale of the *Schubert* case and either overrule or distinguish the *Riegger* case," the Court pointed to *Fernandez, Ennis,* and *Hudson* and said it "decline[d] to change the rule," that any change must come from the General Assembly.

At the time this problem was before the Court in *Stokes,* there were but few decisions in which courts had abolished the common law doctrine of interspousal tort immunity. *See, e.g., Self v. Self,* 58 Cal. 2d 683, 26 Cal. Rptr. 97, 376 P. 2d 65 (1962) (abolishing such immunity as to intentional torts), followed by *Klein v. Klein,* 58 Cal. 2d 692, 26 Cal. Rptr. 102, 376 P. 2d 70 (1962) (completely abolishing such immunity); *Lorang v. Hays,* 69 Idaho 440, 209 P. 2d 733 (1949) (as to an intentional tort); *Apitz v. Dames,* 205 Ore. 242, 287 P. 2d 585 (1955) (husband had shot and killed his wife; immunity abolished limited to the facts in that case); and *Goode v. Martinis,* 58 Wash. 2d 229, 361 P. 2d 941 (1961) (limited to an intentional tort committed by one spouse against the other during the pendency of previously initiated divorce proceedings when the parties are legally separated). Cases relative to the subject generally are collected and analyzed in Annot., 43 A.L.R.2d 632 (1955), and its various supplements.

Since this Court's decision in *Stokes* in 1968 there has been a parade of cases in which courts have altered the previous common law rule. *See, e.g., Rogers v. Yellowstone Park Company,* 97 Idaho 14, 539 P. 2d 566 (1974) (auto negligence cases); *Brooks v. Robinson,* 259 Ind. 16, 284 N.E.2d 794 (1972) (doctrine abrogated for all cases); *Moulton v. Moulton,* 309 A. 2d 224 (Me. 1973) (wife permitted to sue husband for tort occurring prior to marriage); *Lewis v. Lewis,* 370 Mass. 619,

---

**3.** In Fields v. Synthetic Ropes, Inc., 215 A. 2d 427 (Del. 1965), the court held that although in Delaware one spouse may not sue the other in an action at law, a "suit m[ight] be brought against an employer based upon the tort of his employee, even though the employee, himself, m[ight] have immunity from such a suit brought by the particular plaintiff."

351 N.E.2d 526 (1976) (Wife sued husband as a result of an automobile accident). Justice Reardon said for the court:

"We conclude therefore that it is open to this court to reconsider the common law rule of interspousal immunity and, having done so, we are of opinion that it should no longer bar an action by one spouse against another in a case such as the present one. We believe this result is consistent with the general principle that if there is tortious injury there should be recovery, and only strong arguments of public policy should justify a judiciaiiy created immunity for tortfeasors and bar to recovery for injured victims." *Id.* at 629, 351 N.E.2d at 532.

The Massachusetts court expressly "limit[ed its] holding . . . to claims arising out of motor vehicle accidents."); *Beaudette v. Frana,* 285 Minn. 366, 373, 173 N.W.2d 416 (1969) ("We hold that the absolute defense of interspousal immunity in actions for tort is abrogated prospectively, as to all causes of action arising after this date, and is abrogated as to the instant cases."); *Rupert v. Stienne,* 90 Nev. 397, 528 P. 2d 1013, 1017 (1974) (doctrine of interspousal immunity abrogated as "to claims arising out of motor vehicle accidents"); *Merenoff v. Merenoff,* 76 N. J. 535, 388 A. 2d 951 (1978) (The court said:

"[W]e recognize that there still remain situations wherein, as a matter of law or fact, claims for personal injuries between married persons will not justify a recovery of damages. We hold that, subject to these excepted areas which are best left to be defined and developed on a case-by-case basis, there presently exists no cogent or logical reason why the doctrine of interspousal tort immunity should be continued and it is hereby abrogated as a bar to a civil suit between married persons for damages for personal injuries." *Id.* at 551.);

*Small v. Rockfeld,* 66 N. J. 231, 240-41, 330 A. 2d 335 (1974) (Doctrines of interspousal and intrafamilial immunity did not bar action by grandmother, on behalf of grandson, to recover

from the son's father for wrongful death of his mother, who allegedly was murdered by the father.); *Immer v. Risko,* 56 N. J. 482, 485, 488, 495, 267 A. 2d 481 (1970) (The court characterized the common law unity of husband and wife as "fictitious . . ., [a] metaphysical concept [which] cannot be seriously defended today," and abrogated the doctrine of interspousal immunity insofar as it pertained to claims arising out of motor vehicle accidents.); *Maestas v. Overton,* 87 N. M. 213, 531 P. 2d 947, 948 (1975) ("There is no immunity from tort liability between spouses by reason of that relationship."); *Bounds v. Caudle,* 560 S.W.2d 925, 927 (Tex. 1977) (The court "abolish[ed] the rule established in *Nickerson* [*and Matson v. Nickerson,* 65 Tex. 281 (1886)] to the extent that it would bar all claims for wilful or intentional torts."); *Richard v. Richard,* 131 Vt. 98, 101, 106, 300 A. 2d 637 (1973) ("[T]he time has come . . . to overrule the harsh dictate of *Comstock* [*v. Comstock,* 106 Vt. 50, 169 A. 903 (1934),] in respect to the right of a married woman to maintain an action against her husband for personal injuries, received by her during her marriage while riding as a guest in an automobile operated by her husband, by reason of his negligence," with the decision being "explicitly limit[ed] . . . to claims by a wife against a husband arising out of motor vehicle accidents."); *Surratt, Adm'r v. Thompson,* 212 Va. 191, 183 S.E.2d 200 (1971) (The administrator of a wife sued the husband as a result of her death in an automobile accident. The court said:

> "Nothing in the nature of the common law required us in *Smith v. Kauffman, Adm'r,* [212 Va. 181, 183 S.E.2d 190 (1971)], to adhere to a parental immunity rule that no longer appeals to reason under today's high incidence of insurance covering automobile accidents. Likewise, nothing in the nature of the common law requires us to adhere to an outmoded concept that a wife cannot so separate herself from her husband's flesh as to be capable of maintaining an action against him. We therefore hold that the plaintiff can maintain this action." *Id.* at 194);

and *Freehe v. Freehe*, 81 Wash. 2d 183, 189, 500 P. 2d 771 (1972) (Rule of interspousal immunity or disability which precludes one spouse from suing the other for a tort committed during coverture is no longer recognized.).

We do not mean to suggest that all courts which have considered such cases in the last decade have jumped on the bandwagon of those who would abolish interspousal immunity. A number of decisions have upheld that doctrine, even where the marital relationship had terminated before the filing of the tort action. *See, e.g., Burns v. Burns,* 111 Ariz. 178, 526 P. 2d 717, 720 (1974) (A divorced spouse was denied the right to institute an action for negligence. The court said, "Although we are not unaware of the many countervailing arguments in favor of complete abrogation, we still feel that such a measure should be accomplished by legislative action rather than through judicial fiat."); *Short Line, Inc. of Penn. v. Perez,* 238 A. 2d 341, 343 (Del. 1968) (dicta); *Bencomo v. Bencomo,* 200 So. 2d 171, 172 (Fla. 1967) (Suit by wife (after divorce) against her former husband for an intentional tort allegedly committed during marriage. The court said, "[O]ne spouse can not sue the other because, under the common law, they are one person."); *Ebel v. Ferguson,* 478 S.W.2d 334 (Mo. 1972), overruling *Ennis v. Truhitte,* 306 S.W.2d 549 (Mo. 1957); *State Farm Mutual v. Leary,* 168 Mont. 482, 486, 544 P. 2d 444 (1975) ("We do not believe this is an area requiring judicial modification of the common law to prevent great injustice. This is a question of public policy best left to the legislative branch of government which is the proper body to determine and set forth public policy."); *Thomas v. Herron,* 20 Ohio St.2d 62, 67-68, 253 N.E.2d 772 (1969) (injuries arose prior to marriage); *DiGirolamo et al. v. Apanavage,* 454 Pa. 557, 312 A. 2d 382 (1973) (wife not permitted to recover for damages caused by tort committed prior to marriage); *Wooley v. Parker,* 222 Tenn. 104, 109, 432 S.W.2d 882 (1968) (surviving wife not permitted to recover from husband's estate for injuries sustained in accident); and *Adams, Adm'x. v. Grogg,* 153 W. Va. 55, 58, 166 S.E.2d 755 (1969).

Although the courts have been divided on this issue, the commentators have been nearly unanimous in their criticism of the common law rule of immunity. *See, e.g.,* W. Prosser, *Handbook of the Law of Torts,* § 122 (4th ed. 1971) (At 864 Prosser states, "The devastating attack on the old rule found in a number of recent decisions seems to leave no possible justification for it except that of historical survival."); 1 F. Harper & F. James, *The Law of Torts* § 8.10 (1956) (At 645 the authors state, "The rule denying recovery has been applied literally and blindly in many cases where the reason for the rule could not possibly apply inasmuch as there was no home to disrupt and no domestic harmony to disturb." At 646. they state, "The metaphysical and practical reasons which prevented such actions at common law are no longer applicable."); and McCurdy, *Personal Injury Torts Between Spouses,* 4 Vill. L. Rev. 303 (1959).[4] In the latter article Professor McCurdy states:

"There is no reason to think that in the case of intentional, wilful, and wanton injury an action would disrupt domestic harmony, since the conduct leading to the action has already caused the disruptions; and indeed there is every reason to think that denial of an action might be more disruptive in that it might lead to resort to other admittedly available redress such as to be found in the criminal and divorce law. Besides, a substantial number of states have for years allowed such interspousal tort actions either by decision or by express statute and it would be impossible to demonstrate that more

---

4. The interested reader may wish to examine some of the following commentaries: Greenstone, *Abolition of Intrafamilial Immunity,* 7 Forum 82 (1972); McCurdy, *Torts Between Persons in Domestic Relation,* 43 Harv. L. Rev. 1030 (1930); Note, *Domestic Relations — Abrogation of Interspousal Immunity — An Analytical Approach,* 19 De Paul L. Rev. 590 (1970); Note, 13 Duq. L. Rev. 156 (1974); Note, *Litigation Between Husband and Wife,* 79 Harv. L. Rev. 1650 (1966); Comment, *Toward Abolition of Interspousal Tort Immunity,* 36 Mont. L. Rev. 251 (1975); Comment, *Lewis v. Lewis: Dissolving the "Metaphysical" Merger in Interspousal Torts,* 12 New Eng. L. Rev. 333 (1976); Comment, *Interspousal Immunity — Time for a Reappraisal,* 27 Ohio St. L. J. 550 (1966); Comment, 3 Rut.-Cam. L. J. 183 (1971); Note, 6 Seton Hall L. Rev. 746 (1975); and Comment, 11 Suffolk U. L. Rev. 1214 (1977).

domestic disharmony exists because of it. In the case of negligent injury where there is liability insurance it is quite implausible to think that a civil damage action would be productive of domestic disharmony except in the employer cases if the employee is not covered. The danger of fraudulent collusion is more plausible. But is there any indication that there would be more danger of fraudulent claims than in cases between persons not so related, and that the courts cannot cope with the one as well as the other? In a substantial number of states interspousal actions for negligent injury have also for years been allowed. And again neither the extent of such claims can be given nor the extent of suspected marital collusion be demonstrated even by liability insurers who would be in a position to have figures in such cases if it were thought sufficiently worthwhile. Questions of policy should not be injected and determined by purely a priori conceptions." *Id.* at 336-37.

Some of the cases discussing interspousal immunity have also discussed the analogous matter of parental immunity. Many of the same reasons advanced elsewhere for interspousal immunity are advanced for parental immunity. Therefore, *Mahnke v. Moore,* 197 Md. 61, 77 A. 2d 923 (1951), is of interest. In that case a child sought to recover from the estate of her father for the personal injury caused her when the father murdered her mother, with a shotgun, in the child's presence; kept her with the dead body for six days and then, on the seventh day, committed suicide with a shotgun in such a manner that masses of his blood lodged upon her face and clothing. She claimed to have suffered shock, mental anguish, and permanent nervous and physical injuries. Judge Delaplaine said for the Court that "there is nothing in the English decisions to suggest that at common law a child could not sue a parent for a personal tort." He then referred to cases elsewhere saying that such suits could not be maintained and to the decision of this Court in *Yost v. Yost,* 172 Md. 128, 134, 190 A. 753 (1937), holding that a minor child

could not maintain a suit in equity against the father for failure to provide support or for neglect and this Court's statement in that case that upon grounds of public policy a parent could not be held liable for acts of passive negligence incident to the parental relation. The Court then went on to say that in the circumstances before it in *Mahnke* "there c[ould] be no basis for the contention that the daughter's suit against her father's estate would be contrary to public policy, for the simple reason that there [was] no home at all in which discipline and tranquillity [might] be preserved." In permitting such suit, the Court said:

> "[W]hen, as in this case, the parent is guilty of acts which show complete abandonment of the parental relation, the rule giving him immunity from suit by the child, on the ground that discipline should be maintained in the home, cannot logically be applied, for when he is guilty of such acts he forfeits his parental authority and privileges, including his immunity from suit. Justice demands that a minor child shall have a right of action against a parent for injuries resulting from cruel and inhuman treatment or for malicious and wanton wrongs." 197 Md. at 68.

It will be seen that in none of the prior Maryland cases has there been an allegation of an intentional tort, much less the outrageous conduct here set forth. Moreover, at no time since *Furstenburg,* 152 Md. 247 (1927), has the Court examined the foundation upon which our holdings rest. It will be recalled that in *Furstenburg* the Court relied upon the Supreme Court's opinion in *Thompson,* 218 U. S. 611, which was an assault and battery case, although we are unable to glean the details of that incident from the Supreme Court's opinion. There was a strong dissent filed in *Thompson* by Mr. Justice Harlan, in which Justices Holmes and Hughes joined. He said:

> "The court below held that these provisions did not authorize an action for *tort* committed by the husband against the wife [, referring to the District

of Columbia statute which is very similar to our Art. 45, §§ 4 and 5].[5]

5. We set forth the District of Columbia and Maryland statutes in parallel columns for purposes of comparison:

District of Columbia Code:

"Sec. 1151. All the property, real, personal, and mixed, belonging to a woman at the time of her marriage, and all such property which she may acquire or receive after her marriage from any person whomsoever, by purchase, gift, grant, devise, bequest, descent, in the course of distribution, by her own skill, labor, or personal exertions, or as proceeds of a judgment at law or decree in equity, or in any other manner, shall be her own property as absolutely as if she were unmarried, and shall be protected from the debts of the husband and shall not in any way be liable for the payment thereof: Provided, That no acquisition of property passing to the wife from the husband after coverture shall be valid if the same has been made or granted to her in prejudice of the rights of his subsisting creditors.

"Sec. 1155. Married women shall have power to engage in any business, and to contract, whether engaged in business or not, and to sue separately upon their contracts, and also to sue separately for the recovery, security or protection of their property, and for torts committed against them, as fully and freely as if they were unmarried; contracts may also be made with them, and they may also be sued separately upon their contracts, whether made before or during marriage, and for wrongs independent of contract committed by them before or during their marriage, as fully as if they were unmarried, and upon judgments recovered against them execution

Maryland Code Art. 45:

"§ 4. Married women shall hold all their property of every description for their separate use, as fully as if they were unmarried, and shall have all the power to dispose of by deed, mortgage, lease, will or any other instrument that husbands have to dispose of their property, and no more.

"§ 5. Married women shall have power to engage in any business, and to contract, whether engaged in business or not, and to sue upon their contracts, and also to sue for the recovery, security or protection of their property, and for torts committed against them, as fully as if they were unmarried; contracts may also be made with them, and they may also be sued separately upon their contracts, whether made before or during marriage, and for wrongs independent of contract committed by them before or during their marriage, as fully as if they were unmarried; and upon judgments recovered against them, execution may be issued as if they were unmarried; nor shall any

"In my opinion these statutory provisions, properly construed, embrace such a case as the present one. If the words used by Congress lead to such a result, and if, as suggested, that result be undesirable on grounds of public policy, it is not within the functions of the court to ward off the dangers feared or the evils threatened simply by a judicial construction that will defeat the plainly-expressed will of the legislative department. With the mere policy, expediency or justice of legislation the courts, in our system of government, have no rightful concern. Their duty is only to declare what the law is, not what, in their judgment, it ought to be — leaving the responsibility for legislation where it exclusively belongs, that is, with the legislative department, so long as it keeps within constitutional limits. Now, there is not here, as I think, any room whatever for mere construction — so explicit are the words of Congress. Let us follow the clauses of the statute in their order. The statute enables the married woman to take, as her own, property of any kind, no matter how acquired by her, as well as the avails of her skill, labor or personal exertions, 'as absolutely *as if she were unmarried.*' It then confers upon married women the power to engage in any business, no matter what, and to enter into contracts, whether engaged in business or not, and to sue separately upon those contracts. If the

---

may be issued as if they were unmarried; nor shall any husband be liable upon any contract made by his wife in her own name and upon her own responsibility, nor for any tort committed separately by her out of his presence without his participation or sanction: Provided, That no married woman shall have power to make any contract as surety or as guarantor, or as accomodation drawer, acceptor, maker, or indorser."

husband be liable upon any contract made by his wife in her own name and upon her own responsibility, nor for any tort committed separately by her out of his presence, without his participation or sanction."

statute stopped here, there would be ground for holding that it did not authorize this suit. But the statute goes much farther. It proceeds to authorize married women 'also' to sue separately for the recovery, security or protection of their property; still more, they may sue, separately, 'for *torts* committed against *them,* as fully and freely *as if they were unmarried.*' No discrimination is made, in either case, between the persons charged with committing the tort. No exception is made in reference to the husband, if he happens to be the party charged with transgressing the rights conferred upon the wife by the statute. In other words, Congress, by these statutory provisions, destroys the unity of the marriage association as it had previously existed. It makes a radical change in the relations of man and wife as those relations were at common law in this District. In respect of business and property the married woman is given absolute control; in respect of the recovery, security and protection of her property, she may sue, separately, in *tort,* as if she was unmarried; and in respect of herself, that is, of her person, she may sue, separately, as fully and freely, as if she were unmarried, 'for *torts* committed *against her.* ' So the statute expressly reads. But my brethren think that notwithstanding the destruction by the statute of the unity of the married relation, it could not have been intended to open the doors of the courts to accusations of all sorts by husband and wife against each other; and, therefore, they are moved to add, by construction, to the provision that married women may 'sue separately . . . for torts committed against them as fully and freely as if they were unmarried' these words: 'Provided, however, that the wife shall *not* be entitled, in any case, to sue her husband separately for a tort committed *against her person.* ' If the husband violently takes possession of his wife's property and withholds it from her she may,

*under the statute,* sue him, separately, for its recovery. But such a civil action will be one in tort. If he injures or destroys her property she may, *under the statute,* sue him, separately, for damages. That action would also be one in tort. If these propositions are disputed, what becomes of the words in the statute to the effect that she may 'sue separately for the recovery, security and protection' of her property? But if they are conceded — as I think they must be — then Congress, under the construction now placed by the court on the statute, is put in the anomalous position of allowing a married woman to sue her husband separately, in tort, for the recovery of her property, but denying her the right or privilege to sue him separately, in tort, for damages arising from his brutal assaults upon her person. I will not assume that Congress intended to bring about any such result. I cannot believe that it intended to permit the wife to sue the husband separately, in tort, for the recovery, including damages for the detention, of her property, and at the same time deny her the right to sue him, separately, for a tort committed against her person.

"I repeat that with the policy, wisdom or justice of the legislation in question this court can have no rightful concern. It must take the law as it has been established by competent legislative authority. It cannot, in any legal sense, make law, but only declare what the law is, as established by competent authority.

"My brethren feel constrained to say that the present case illustrates the attempt, often made, to effect radical changes in the common law by mere construction. On the contrary, the judgment just rendered will have, as I think, the effect to defeat the clearly expressed will of the legislature by a construction of its words that cannot be reconciled with their ordinary meaning." *Id.* at 621-24 (emphasis in original).

Much of what Mr. Justice Harlan said in his dissent in *Thompson* could be said by way of analysis of the Maryland act, as Judge Hammond implied for the Court in *Fernandez,* 214 Md. at 524, when he indicated that the literal language of Art. 45, § 5 would authorize the type of suit we here have before us.[6] *Thompson* was decided nine years before the adoption of the 19th Amendment and *Furstenburg,* eight years after its adoption. One senses in *Thompson* a reluctance to permit change. Certainly Justices Harlan, Holmes, and Hughes, the dissenters in *Thompson,* constituted three of the great minds of the Supreme Court of the United States in 1910.

We can conceive of no sound public policy in the latter half of the 20th-century which would prevent one spouse from recovering from another for the outrageous conduct here alleged. There certainly can be no domestic tranquility to be preserved in the face of allegations such as we have before us. It will be recalled that in *Gregg,* 199 Md. at 667, Chief Judge Marbury said for the Court, "After discord, suspicion and distrust have entered the home, it is idle to say that one of the parties shall not be allowed to sue the other because of fear of bringing in what is already there." It will further be recalled that he labeled as "artificial" the theory that "the identity of husband and wife persists in its original vigor until it has been completely dissolved by express legislative mandate . . . ."

The General Assembly has not heeded the suggestions by this Court that a new statute be enacted. Insofar as the interpretation to be given to the present statute is concerned, we have said many times that the cardinal rule of statutory construction is to ascertain and carry out the real legislative intent, and in ascertaining that intent the court considers the language of an enactment in its natural and ordinary signification. *See, e.g., Howell v. State,* 278 Md. 389, 392, 364 A. 2d 797 (1976), and the cases there cited. For purposes of our decision here today, however, we need not be involved

---

**6.** It must be remembered, that stripped of excess verbiage, what Art. 45, § 5 says is: "Married women shall have power ... to sue ... for torts committed against them, as fully as if they were unmarried . . . ."

with statutory construction nor need we be involved with our prior cases other than for dicta appearing in them to the effect that one spouse may not sue another for tort. None of our prior cases has involved an intentional tort. We find nothing in our prior cases or elsewhere to indicate that under the common law of Maryland a wife was not permitted to recover from her husband in tort when she alleged and proved the type of outrageous, intentional conduct here alleged. Note that under the common law in England as reflected in Blackstone it was under "the *old* common law" that a husband "might give his wife moderate correction." (Emphasis added.) The type of action in the case at bar not being forbidden by the common law of this State or any statute of this State, it follows that the trial court erred.

*Judgment reversed; costs to abide the final result.*