806 A.2d 787

**Gene VAUGHN**

v.

**Jay VAUGHN.**

No. 1232, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Sept. 5, 2002.

Andrea L. Shapiro, Clinton, for appellant.

Paul Bauer Eason, Greenbelt, for appellee.

KENNEY, DEBORAH S. EYLER, LAWRENCE F. RODOWSKY (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

The Circuit Court for Prince George's County, sitting without a jury, returned a verdict in favor of Jay Vaughn ("Jay"), the appellee, and against his wife, Gene Vaughn ("Gene"), the appellant, on claims for breach of contract and conversion, and entered judgment for $7,060. The court found against Gene on her counterclaim for conversion. In doing so, it made a finding on the record that certain United States Treasury Bonds titled in Gene's name are Jay's property.

Gene appeals from the judgment of the circuit court, posing the following question for review, which we have rephrased:

Did the trial court err in ruling that the United States Treasury Bonds titled in her name are Jay's property?

For the following reasons, we shall vacate the judgment of the circuit court on Gene's counterclaim and remand the case to that court with instructions.

## FACTS AND PROCEEDINGS

Jay and Gene were married on October 15, 1996. It was the second marriage for each. They had no children together, though each have children from prior marriages.

For the first ten months of the marriage, Jay and Gene lived apart. They began cohabiting in August 1997, when Jay moved into Gene's house, in Brandywine, Prince George's County. Jay and Gene separated on June 23, 2000.

On December 1, 2000, in the Circuit Court for Prince George's County, Jay sued Gene for conversion, breach of

contract, abuse of process, fraud in the inducement, and injunctive relief ("the tort action"). Jay alleged that when the parties separated, he moved out of the marital home and left behind several items of personal property. Later, Gene agreed to give him access to the marital home at a specific date and time to remove those items. When the agreed date and time arrived, however, Gene refused to let Jay in the house. His items of personal property thus remained in the marital home. Jay claimed that Gene's conduct was a breach of their agreement and a conversion of his items of personal property. He attached to his complaint a list of the items he claimed Gene had converted, with valuations. According to Jay, the value of the items totaled $21,470.

Gene filed an answer in the tort action on January 4, 2001.

On January 23, 2001, also in the Circuit Court for Prince George's County, Jay filed a complaint for limited divorce against Gene ("the divorce action"), alleging he and Gene had mutually and voluntarily separated on June 23, 2000, with the intention of ending their marriage. Jay asked the court to resolve any dispute between them respecting their property.

On February 12, 2001, Gene filed an answer in the divorce action, admitting the parties had separated as alleged, with the intention of ending their marriage. The same day, she filed a counterclaim for conversion in the tort action, alleging that when Jay left the marital home, he took certain of her personal property and converted it to his own use. Gene attached to her counterclaim an itemized list of the items she claimed Jay had converted, with valuations. The most valuable items listed were certain United States Treasury Bonds, titled in Gene's name, that she claimed were worth $28,000. Gene assigned the other items (all small pieces of personal property) values totaling $1,000. Gene alleged that she had demanded the return of the items but Jay had refused.

On July 3, 2001, Gene filed a counter-complaint for absolute divorce in the divorce action. She also filed a motion to stay in the tort action, pending the outcome of the divorce action, asserting that the same property was in dispute in both

actions. Jay opposed the motion, and on July 11, 2001, the court issued an order denying it.

On July 12, 2001, the parties appeared before the court for a bench trial in the tort action. At the outset, Gene renewed her motion to stay, arguing that the property at issue was "disputed marital and non-marital property"; that a spouse cannot convert marital property, and therefore it was necessary for the court to determine whether the property at issue was marital or non-marital for it to decide the conversion claim and counterclaim; and the proper forum for that determination was the divorce action, not the tort action.

In response, Jay's lawyer acknowledged that, with respect to the counterclaim, the parties were disputing whether the United States Treasury Bonds were marital property; he agreed, for that reason, that the divorce action was the proper forum in which to resolve that dispute. With respect to Jay's conversion claim, however, Jay's lawyer pointed out that of the 67 items Jay was claiming were non-marital and that Gene had converted, 15 were items Gene already had acknowledged as being non-marital, in answers to interrogatories. Jay's lawyer suggested that the court proceed with the tort action as to those items only.

Ultimately, and over Gene's protest, the court left to Jay the decision whether to go forward with the conversion claim on all or some of the items he was claiming Gene had converted, and with the counterclaim for conversion of the bonds. Despite his lawyer's advice to the contrary, Jay asked the court to proceed with his conversion claim on all the property, including the items of disputed marital property, and to proceed with the counterclaim. The court then did so.

Jay testified that in 1993, he purchased some United States Treasury Bonds to fund his children's education. The bonds were titled in his name. By 1997, after he and Gene had married, Jay found himself in debt and pursued by creditors. He decided to try to hide the bonds from his creditors by redeeming them and giving the proceeds to Gene.

Further to his plan, in late June 1997, Jay redeemed the bonds for approximately $35,000 and gave the money to Gene. Documents moved into evidence included checks Jay wrote to Gene in July 1997, after he redeemed the bonds, for sums totaling approximately $35,000. Also in July 1997, Gene used the money from Jay to purchase United States Treasury Bonds, which she titled in her name. According to Jay, Gene agreed to hold the new bonds for him; therefore, the new bonds were not marital property. Rather, they were "[Jay's] property that [Gene] was holding for [him]."

In 1999, Jay filed for bankruptcy. He did not include any bonds in his disclosure of personal property in the bankruptcy case.

Jay further testified that he is a cab driver and throughout the marriage he was working in that capacity and earning an annual income of approximately $20,000.

Gene testified that before moving into her house, in August 1997, Jay announced that he planned to continue running a start-up business that had yet to turn a profit, and that he did not intend to continue driving a cab. Because Jay was not going to be bringing any income to the marriage, he agreed to redeem his United States Treasury Bonds and give Gene the proceeds to contribute to the household and otherwise use as she saw fit. After Jay redeemed the bonds and gave her the proceeds, Gene decided to use the money to purchase her own United States Treasury Bonds. She did so, and titled them in her name. She planned to use the bonds to fund her daughter's education.

Gene is an accountant, and was employed in several positions during the course of the marriage.

Gene further testified that when the parties first experienced marital problems, in March 2000, Jay moved out of their bedroom into an extra room in the house. Gene's United States Treasury Bonds were in a box in that room. When Jay moved out of the house, he took several boxes, including the

box containing the bonds. Gene demanded that Jay return the bonds, but he refused.

At the conclusion of the evidence and after hearing argument of counsel, the court ruled from the bench. It granted motions for judgment on Jay's claims for abuse of process and fraudulent inducement, and then ruled in Jay's favor on his breach of contract and conversion claims. Jay's itemized list of personal property allegedly converted by Gene had been admitted into evidence. The court rejected the values assigned to the items on that list, but with some exceptions, accepted the values testified to by Jay, which totaled $10,710. The court excluded several items that it identified and in one case ruled was marital property, and then valued the remaining items of personal property at $7,060.

The court found that the parties had entered into an oral agreement for Jay to have access to the marital home to retrieve those items of personal property and that Gene had breached the agreement. It further found that Gene had "exercised . . . dominion over [the] property," thereby committing the tort of conversion. The court concluded that it was not a sufficient remedy for Gene to return the converted items, because Jay had had to expend sums to replace them and, on that basis, entered judgment in favor of Jay for $7,060. The court denied Jay's request for injunctive relief, concluding it was moot.

The court then turned its attention to Gene's counterclaim for conversion of the United States Treasury Bonds. It stated, "[t]he [c]ourt is only concerned here with whose property it is, and I bel[ie]ve it [the bonds] was his. . . ." Acknowledging "fraud" by both parties, the court credited Jay's testimony that he had given the proceeds of his redeemed United States Treasury Bonds to Gene not for her to use but for her to hold, for his benefit, to keep the money from his creditors. Jay's lawyer then asked the court: "Would you just indicate, just for clarity, that all the bonds that were purchased you found of (sic) [Jay's] property?" The court responded, "Defendant's Exhibit two, those bonds that are in the name of

Gene Vaughn belong to Jay Vaughn." [1] The court denied Gene's counterclaim for conversion of the bonds.

The clerk of court entered a form judgment order on July 20, 2001. Gene noted her appeal on August 7, 2001.

Thereafter, on September 14, 2001, at the request of Gene and over the objection of Jay, the circuit court (by a judge other than the one who presided over the tort action) stayed the divorce action, pending disposition of this appeal.

## DISCUSSION

Gene only has appealed the circuit court's judgment against her on her counterclaim for conversion of the United States Treasury Bonds titled in her name. She is not challenging on appeal the circuit court's judgment against her and in favor of Jay on his claims for conversion and breach of contract.

■ The circuit court based its denial of Gene's counterclaim for conversion on its finding that the bonds titled in Gene's name are Jay's personal property. A conversion is "any distinct act of ownership or dominion exerted by one person *over the personal property of another* in denial of his right or inconsistent with it." *Interstate Ins. Co., v. Logan,* 205 Md. 583, 588–89, 109 A.2d 904 (1954) (emphasis added). Accordingly, having found that the bonds belong to Jay, the court necessarily could not find that he had converted them. Gene argues that the circuit court's finding that the bonds are Jay's personal property was clearly erroneous and was tantamount to a transfer of ownership of the bonds from one spouse to another, which the court was without power to do.

Jay responds that the circuit court simply rejected Gene's testimony that the $35,000 he received and gave her when he redeemed his United States Treasury Bonds was a gift. Rather, it accepted his testimony that he gave Gene that sum

---

1. Gene's Exhibit 2 consisted of copies of the United States Treasury Bonds titled in her name.

only temporarily and for the sole purpose of holding it for him to keep it away from his creditors.

When asked in oral argument in this Court the significance, if any, of the circuit court's finding that the bonds are Jay's property, Jay's lawyer responded that the finding establishes that Jay is the owner of the bonds and they are his non-marital property; and that finding will have preclusive effect, under the doctrine of collateral estoppel, in the divorce action.

For the reasons we shall explain, we are in partial agreement with Gene. We interpret Gene's argument about the power of the circuit court to make a factual finding respecting ownership of the bonds as a challenge to the court's subject matter jurisdiction. We conclude that while the court did not lack subject matter jurisdiction, it nevertheless abused its discretion by not declining to exercise jurisdiction over this case during the pendency of the divorce action, *i.e.*, by not staying the tort action until the divorce action was over. To explain our reasoning, we first must set forth some general legal principles for context.

■ The common law equity jurisdiction of the circuit court empowers it to decide property ownership disputes, including those between spouses. "[I]t has long been recognized that either a husband or wife can sue the other in equity for the protection of his or her property." *Blumenthal v. Monumental Security Storage, Inc.,* 271 Md. 298, 302, 316 A.2d 243 (1974). In a divorce action, however, the circuit court does not sit in the exercise of its broad common law equity powers. Rather, its jurisdiction is limited and statutory; it has only the powers afforded it by the legislature. For example, while it is within the general equity power of the circuit court to transfer property from one person to another, including from one spouse to another, in a divorce action the circuit court " 'has no power to transfer the property of either spouse to the other, or otherwise dispose of it,' " except as expressly permitted by statute. *Gebhard v. Gebhard,* 253 Md. 125, 129, 252 A.2d 171 (1969) (quoting *Dougherty v. Dougherty,* 187 Md. 21, 32, 48 A.2d 451 (1946)).

Md.Code (1979 Repl.Vol., 2001 Supp.), section 8–202 of the Family Law Article (FL), authorizes the circuit court in a divorce case to determine ownership of property. Specifically, when a circuit court grants an annulment or a limited or absolute divorce, it "may resolve any dispute between the parties with respect to the ownership of personal property." FL § 8–202(a)(1). Likewise, when the court grants an annulment or absolute divorce, it "may resolve any dispute between the parties with respect to the ownership of real property." FL § 8–202(a)(2). Once the court determines the ownership of the personal and/or real property of the divorcing spouses, it may issue a decree stating the ownership interest of each party and, as to any jointly owned property, it may order a partition or sale in lieu of partition and a division of the proceeds. FL § 8–202(b).

Although the court has these statutorily conferred powers to determine ownership in a divorce action, it "may not transfer ownership of personal or real property from 1 party to the other," except with respect to pensions and retirement plans, as permitted by FL § 8–205. FL § 8–202(a)(3).

One of the functions of the circuit court in a divorce action is to equitably distribute the parties' "marital property." " 'Marital property' means the property, however titled, acquired by 1 or both parties during the marriage." FL § 8–201(e)(1). The marital or non-marital characteristic of property is for the most part *not* a function of ownership or title. Except for real property covered by FL § 8–201(e)(2), "marital property" does not include property acquired before the marriage, acquired by inheritance or gift from a third party, excluded by valid agreement, or directly traceable to any of those sources. FL § 8–201(e)(3).

When spouses in a divorce action are disputing whether certain property is marital, the court "shall determine which property is marital." FL § 8–203(a). Once the court has determined which of the property, regardless of ownership, is marital, it must value the marital property. FL § 8–204(a). Then, after considering the applicable factors under FL § 8–

205(b), it must decide whether to grant a monetary award to adjust the equities of the parties. One of those factors is the value of all property interests of the parties, *i.e.,* their marital *and* non-marital property. FL § 8–205(b)(2).

It bears repeating that property titled in the name of one spouse or owned by one spouse may nevertheless be "marital property." *Harper v. Harper,* 294 Md. 54, 78, 448 A.2d 916 (1982) (determination of what constitutes marital property does not depend on concept of title). Indeed, the very purpose of the court's granting a monetary award is to adjust the equities of the parties in the distribution of their marital property when division by title would be unfair. *Schweizer v. Schweizer,* 55 Md.App. 373, 377, 462 A.2d 562 (1983), *aff'd in part, remanded in part,* 301 Md. 626, 484 A.2d 267 (1984). In addition, the marital character of personal property owned by one spouse does not mean that property cannot be converted by the other spouse, if he or she commits a distinct act of ownership or dominion over the property that is in denial of the other spouse's right or is inconsistent with it. Any such conversion would not affect the marital character of the converted property, however.

Marital property disposed of before the date of divorce is not subject to equitable distribution. When a spouse before divorce or during a pre-separation period in which the marriage is undergoing an irretrievable breakdown dissipates marital property in order to exclude it from the marital estate, the property will be considered extant marital property and be valued together with the other existing marital property. *Sharp v. Sharp,* 58 Md.App. 386, 399, 473 A.2d 499 (1984). Because property owned by both spouses cannot be conveyed without the parties acting jointly, and property titled solely in the name of one spouse cannot be conveyed by the other spouse at all, as a practical matter, the doctrine of dissipation will come to bear when one spouse transfers, for the improper purposes we have described, his or her solely owned but nevertheless marital property.

The authority of the circuit court to determine ownership of property in a divorce action is not exclusive. That is, as we have explained, outside the context of a divorce action, the circuit court has the fundamental power to determine disputes over ownership of property, including such disputes between spouses. In addition, to the extent that ownership of property is a factual issue to be decided by the court as a fact finder in any matter within its common law jurisdiction to decide, including in an action at law, the court has the power to so decide.

■ Quite apart from the common law jurisdiction of the circuit court to decide disputes between spouses outside the context of a divorce action, there are certain public policy limitations that prevent spouses from recovering damages at law against one another in tort actions. While spouses may sue each other for equitable remedies and for breach of contract, *see Spessard v. Spessard,* 64 Md.App. 83, 95–96, 494 A.2d 701 (1985) (equitable remedies); *Dexter v. Dexter,* 105 Md.App. 678, 686, 661 A.2d 171 (1995) (breach of contract), public policy, embodied in the doctrine of interspousal immunity, prohibits them from recovering from each other in tort except when that doctrine does not apply, as with intentional torts based on outrageous conduct, *see Lusby v. Lusby,* 283 Md. 334, 390 A.2d 77 (1978), or when it has been abrogated, as in the tort of negligence, *see Boblitz v. Boblitz,* 296 Md. 242, 462 A.2d 506 (1983). *See Doe v. Doe,* 358 Md. 113, 120–21, 747 A.2d 617 (2000)(observing that Maryland common law retains interspousal immunity for intentional tort claims not based on outrageous behavior and citing with approval the holding in *Linton v. Linton,* 46 Md.App. 660, 664, 420 A.2d 1249 (1980), that "the exception to interspousal immunity under *Lusby* was limited to those intentional torts committed 'against the spousal victim' which were 'outrageous' and which constituted 'atrocious behavior' "). *See also Bozman v. Bozman,* 146 Md.App. 183, 806 A.2d 740 (filed 2002) (holding that the tort of malicious prosecution is not so outrageous as to bring it within the narrow exception to the doctrine of interspousal immunity).

■ Conversion is an intentional tort. As we have stated, it is a " 'distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it.' " *Allied Inv. Corp. v. Jasen,* 354 Md. 547, 560, 731 A.2d 957 (1999) (quoting *Interstate Ins. Co., v. Logan, supra,* 205 Md. at 588–89, 109 A.2d 904). *See also Staub v. Staub,* 37 Md.App. 141, 142–43, 376 A.2d 1129 (1977). "[T]he tort of conversion generally may extend to the type of intangible property rights that are merged or incorporated into a transferable document." *Allied Inv. Co. v. Jasen, supra,* 354 Md. at 562, 731 A.2d 957. The element of intent that must be proven is the intent to exercise dominion and control over the plaintiff's property in a manner inconsistent with the plaintiff's rights. " 'The intent required is not necessarily a matter of conscious wrongdoing.' " *Keys v. Chrysler Credit Corp.,* 303 Md. 397, 414, 494 A.2d 200 (1985) (quoting W. Keeton, *Prosser & Keeton on Torts,* § 15 (5th ed.1984) (footnotes omitted)).

■■ The measure of damages in conversion is the fair market value of the property at the time and place of the conversion. " 'When the defendant satisfies the judgment in the action for conversion, title to the chattel passes to him, so that he is in effect required to buy it at a forced judicial sale.' " *Staub v. Staub, supra,* 37 Md.App. at 144, 376 A.2d 1129 (quoting Restatement (Second) of Torts, § 222A, comments c, d (1965)).

■ As the common law of Maryland now stands, for reasons of public policy, a spouse who converts personal property of the other spouse during the marriage is immune from liability in tort except when the facts alleged and proved support a finding that the tortfeasor spouse's conduct was "outrageous."

Returning to the merits of this case, Gene's motion to stay, Jay's response, and the argument made to the circuit court in the tort action upon Gene's renewal of that motion made plain that Jay and Gene were disputing the ownership and marital or nonmarital character of the United States Treasury Bonds

Gene was alleging Jay had converted. It also was clear that Jay and Gene both had invoked the statutory jurisdiction of the circuit court in the divorce action; that the court in that action would be required to decide both issues (ownership and marital character *vel non* ); and that that court's decisions on those issues would affect its ultimate ruling on the equitable distribution of the parties' marital property. Thus, the issues raised by Gene in her counterclaim for conversion (and by Jay in his claim for conversion, although that is not before us) were directly related to the issues of the respective rights of the parties in their marital and non-marital property, which were and remain to be decided in the divorce action.

 The doctrine of collateral estoppel, which Jay intends to invoke in the divorce action, provides that when parties in a first suit are parties in a subsequent suit on a different cause of action, they are precluded from relitigating in the second suit any fact that was actually litigated and decided in the first suit, and was necessary to the decision in that suit. *In re Nahif A.,* 123 Md.App. 193, 201 n. 2, 717 A.2d 393 (1998) (citing *State v. Woodson,* 338 Md. 322, 331, 658 A.2d 272 (1995)). Thus, according to Jay, because the issue of the ownership of the bonds was actually litigated and decided in the tort action, and was necessary to the court's decision in his favor on Gene's conversion claim, it cannot be relitigated in the divorce action. As we shall explain, for the same reason that Jay is able to make this argument, the circuit court should have granted Gene's motion to stay and refrained from exercising jurisdiction over the conversion claim and counter-claim while the divorce action was pending.

 To be sure, the circuit court in the tort action did not lack the fundamental power to decide the issues raised in the action, including the issue of ownership of the bonds; *i.e.,* it had subject matter jurisdiction, and to the extent its equitable powers were being invoked, in Jay's request for injunctive relief, it had jurisdiction to exercise those powers in resolving the parties' claims. Merely because a court has subject matter jurisdiction does not mean it is proper for the court to

exercise it, however. It long has been held that when two courts have concurrent jurisdiction over the same subject matter, and the actions are materially the same, the court in which suit first was commenced should retain the case and another court should abstain from exercising its jurisdiction and interfering with the first proceeding. *State v. 91st Street Joint Venture*, 330 Md. 620, 628, 625 A.2d 953 (1992); *Wright v. Williams*, 93 Md. 66, 48 A. 397 (1901).

This rule is not directly applicable to the case at bar in that the cases at issue here—the tort action and the divorce action—were not pending in two courts having concurrent jurisdiction. Rather, they both were pending in the same court. The objective of the rule, to avoid conflicting and perhaps irreconcilable rulings in two cases addressing the same or overlapping issues, is relevant, however, and underlies another well-established holding of the Court of Appeals: that in a proper case a court may stay proceedings before it pending the determination of another proceeding that may affect the issues raised. *Coppage v. Orlove*, 262 Md. 665, 666–67, 278 A.2d 587 (1971) (holding that because it was "conceivable that as a result of the earlier action [pending between the parties] the debt sued upon m[ight] be satisfied ... in the interest of justice and orderly judicial processes this cause should have been stayed pending the conclusion of the earlier" action); *Dodson v. Temple Hill Baptist Church, Inc.*, 254 Md. 541, 546, 255 A.2d 73 (1969); *Restivo v. Princeton Constr. Co.*, 223 Md. 516, 521, 165 A.2d 766 (1960); *Resnick v. Kaplan*, 49 Md.App. 499, 512, 434 A.2d 582 (1981).

Whether to grant or deny a stay of proceedings is a matter within the discretion of the trial court, and only will be disturbed if the discretion is abused. *Dodson v. Temple Hill Baptist Church, Inc., supra*, 254 Md. at 546, 255 A.2d 73; *Waters v. Smith*, 27 Md.App. 642, 652–53, 342 A.2d 8 (1975), *aff'd*, 277 Md. 189, 352 A.2d 793 (1976). Like other discretionary decisions trial courts are called upon to make, it is a decision that requires the court to exercise its discretion, and failure to do so is itself error. *Beverly v. State*, 349 Md. 106,

127, 707 A.2d 91 (1998) (citing *Maus v. State*, 311 Md. 85, 108, 532 A.2d 1066 (1987) (citing *Colter v. State*, 297 Md. 423, 427–31, 466 A.2d 1286 (1983))).

In the case at bar, the court erred in failing to exercise discretion to decide whether to stay the tort action. Instead of deciding the issue itself, it put the decision in Jay's hands. It was Jay—over the expressed advice of his lawyer to the contrary—who decided that his and Gene's claims in the tort action would not be stayed pending the divorce action.

The decision whether to grant a stay was the court's, not Jay's, to make. Moreover, the following circumstances so clearly militated in favor of the court refraining from exercising jurisdiction over the tort action until the divorce action was concluded that had the court exercised discretion to deny the stay, it would have abused its discretion.

First, and as we have explained, many of the factual and legal issues in the tort action either are identical to or are interrelated with and dependent on factual and legal issues in the divorce action. In the divorce action, both parties invoked the statutory jurisdiction of the circuit court to change their marital status, *i.e.*, grant them a divorce; and when the court exercises its jurisdiction to do so, it also will be required to make determinations about the parties' property, including decisions about title and marital character, to the extent they are disputed. Respecting the bonds titled in Gene's name, both issues were and are disputed. Had the court in the tort action considered that circumstance, it would have realized the potential that existed for conflicting rulings on title and marital property issues in the two actions and that, given the statutory responsibility of the court in the divorce action to decide the issues, it would not be proper for them to be addressed and decided piecemeal, in a tort action.

Second, while neither Jay nor Gene raised interspousal immunity in defense of the other's tort claim for conversion, neither alleged that the other engaged in outrageous behavior that would render the doctrine inapplicable. *Compare Lusby v. Lusby, supra* (wife alleged that husband ran her off the

road at gunpoint, violently raped her, and assisted two cohorts in attempting to rape her). While Maryland's public policy, as embodied in the doctrine of interspousal immunity, strongly disfavors spouses' making use of the civil tort system to resolve disputes over their personal and property rights, except in those limited situations involving outrageous behavior, its public policy, as expressed in the Marital Property Act, the Alimony Act, and the other statutes governing divorce, favors resolution of all disputes related to the dissolution of marriage in a single proceeding. Exercising jurisdiction over a conversion action between spouses when the spouses are parties to a divorce action, the conduct at issue is not outrageous, as a matter of law, and the title and marital character of the property allegedly converted is disputed does not comport with Maryland's public policy.

Finally, the claims Jay was asserting in addition to conversion—for abuse of process, fraudulent inducement, breach of contract, and injunctive relief—all rested on the conduct of the parties leading up to and occurring during and in the immediate aftermath of their estrangement and separation, including Gene's applying for and obtaining a domestic violence protective order and the parties' attempting to reach agreement about possession of various of their items of personal property pending adjudication of their divorce action. The factual disputes surrounding those events plainly were relevant to the issues in the divorce action. Although neither Gene nor Jay has challenged on appeal the court's rulings on those claims, the existence of the claims as part of the tort action should have had a bearing on the court's decision about whether to exercise jurisdiction over the tort action, and militated strongly against its doing so.

We hold that in the circumstances of this case the trial court should not have exercised jurisdiction over the claims in the tort action while the divorce action was pending. Accordingly, we shall vacate the judgment entered on Jay's counterclaim and remand the case to the trial court to enter a stay of proceedings on that claim.

282

JUDGMENT ON COUNTERCLAIM VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY WITH INSTRUCTIONS. COSTS TO BE PAID BY THE APPELLEE.